# EXHIBIT D

18-2144  Russell v Kiewit, et al  7.15.19                    1

```
 1                 UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
 2

 3   RANDALL H. RUSSELL,

 4     Plaintiff,
                                     Case No. 18-cv-2144
 5     v.

 6   KIEWIT ENERGY GROUP, INC.,
     JOHN JENNINGS,
 7   DAVID FLICKINGER,
     JASON HEFLEY,                   Kansas City, Kansas
 8   KIEWIT CORPORATION,             Date:  7/15/2019
     KIEWIT POWER CONSTRUCTORS CO.,
 9   KIEWIT ENGINEERING GROUP,

10     Defendants.
     .........................

11

12            TRANSCRIPT OF HEARING ON OBJECTIONS
             BEFORE THE HONORABLE KATHRYN H. VRATIL
13          SENIOR UNITED STATES DISTRICT COURT JUDGE

14   APPEARANCES:

15   For the              Patrick G. Reavey
     Plaintiff:           Kevin C. Koc
16                        Reavey Law, LLC
                          1600 Genessee
17                        Suite 303
                          Kansas City, MO 64102
18

19   For the              Christopher R. Hedican
     Defendants:          Baird Holm, LLP
20                        1700 Farnam Street
                          Suite 1500
21                        Omaha, NE 68102

22

23
     _____
24     Proceedings recorded by machine shorthand, transcript
     produced by computer-aided transcription.
25
```

1                         E X H I B I T S

2      Plaintiff's
       Exhibits                    Offered              Received

3
            1                         46                   46
4           2                         27                   27

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Court called to order.)
 2              THE COURT:  Good afternoon.  The court calls
 3    Ronald H. Russell versus Kiewit Energy Group, et al,
 4    Case No. 18-2144.  Will counsel state their appearances
 5    please.
 6              MR. REAVEY:  May it please the court,
 7    Patrick Reavey on behalf of the plaintiff, Randy
 8    Russell.  Mr. Russell is here at counsel table with me
 9    as well as Kevin Koc, a lawyer with my office.
10              THE COURT:  Okay.
11              MR. HEDICAN:  Good afternoon, judge.  Chris
12    Hedican on behalf of the defendants.
13              THE COURT:  Thank you.  On June 4, 2019,
14    plaintiff filed objections to the order of Magistrate
15    Judge O'Hara with regard to his motion to compel.  I
16    thought the most efficient way to deal with this would
17    be to just have oral argument and see if we can resolve
18    these issues here instead of writing a long opinion and
19    plowing through a bunch of paperwork.  So I've done the
20    best I can to read all of your briefs and the many, many
21    attachments on the multiple motions to try and sort to
22    the bottom of where we are with regard to plaintiff's
23    discovery requests.
24              I'm going to say right up front that I have the
25    utmost regard for Judge O'Hara, and so I would not
```

1  likely -- I mean, I would not lightly say that he has

2  abused his discretion, but I do have a lot of unanswered

3  questions about how we got here and where we go from

4  here.

5      I'm going to start with paragraphs 8 and 9 of

6  Plaintiff's Document Production Request.  I take it that

7  the major issue with regard to those is that defendants

8  responded we've done what we can with Mimecast and

9  Judge O'Hara said that's good enough, and nobody has

10  ever addressed why we haven't looked at cell phones,

11  computers, hard drives and other electronic devices.  Is

12  that pretty accurate from a 10,000-foot level?

13          MR. REAVEY:  Yes, Your Honor, from

14  plaintiff's perspective.

15          MR. HEDICAN:  Obviously, judge, I thought

16  Judge O'Hara got it just exactly right --

17          THE COURT:  Of course.

18          MR. HEDICAN:  -- so I would first say that.

19      But, no, I think -- in general I think the issue

20  is largely summarized by you, although we did indicate

21  that we had looked at these things, just not in the way

22  that Mr. Reavey wanted us to.

23          THE COURT:  Okay.  Well, let me tell you

24  sort of my reaction to what I see in the record on this

25  issue.

 1          One is I think it's pretty well-established that

 2   boilerplate objections saying the request is overly

 3   broad or unduly burdensome or not proportional are not

 4   sufficient to raise or preserve objections to the

 5   discovery request.

 6          I look at your objections and they don't really

 7   tell me anything about why the discovery is not

 8   proportional or how it's unduly burdensome.  And I

 9   specifically went looking for this because, in a lot of

10   these document production requests, my first thought was

11   how hard can this be?  Is it really worth all of this

12   litigation over and over and over when some of these

13   documents should be so readily accessible?

14          So number one --

15          And you might make some notes because I would

16   like you to address these.

17          Number one is the sufficiency of your boilerplate

18   objections to raise a legitimate issue as to undue

19   burden and proportionality.  That's what Judge O'Hara

20   hung his hat on and so I'd like to hear you address

21   that.

22          I don't see anything in the record about why

23   defendant did not look at devices other than what's

24   captured in Mimecast, and I don't see any place that

25   Judge O'Hara addressed whether defendant should be

1    required to do that, and if not how that would be unduly

2    burdensome or disproportional.  And I question him

3    putting the responsibility on plaintiff to identify

4    documents that have been withheld.

5         So why don't you come forward and let's talk

6    about those issues.

7              MR. HEDICAN:  Sure.

8         Patrick, I'm just going to move your stuff here.

9              MR. REAVEY:  If you don't mind, I'll just

10   grab it.

11             MR. HEDICAN:  That's fine.

12             THE COURT:  You might get some secret

13   information if it's left up there.

14             MR. HEDICAN:  What's that?

15             THE COURT:  You might get some secret

16   information --

17             MR. HEDICAN:  Yeah, that's right.

18             THE COURT:  -- if he leaves his papers up

19   there.

20             MR. REAVEY:  Also need my pen.

21             MR. HEDICAN:  To start with, judge, I'll

22   address your first point.  And my apologies because I'm

23   not recalling the substance of that objection, so I'm

24   going to be paraphrasing what I recall about that.  I do

25   have it with and I can certainly look at it with a

1    break.

2         But let me tell you my understanding and view on

3    the judge's response on proportionality and relevance,

4    and we're talking about No. 8 and No. 9, the Document

5    Production Request, which said essentially I want every

6    document that was in 11 custodians' files and I want it

7    if it contains the name Randy or Russell in it, and so

8    effectively two first names, judge.  So right off the

9    bat you have a request for documents that contain two

10   names without any other limiting requirement on it.

11        I've been doing this long enough to remember the

12   days before ESI.  But a request for every document that

13   had the name, first or last of the plaintiff, that

14   certain individuals had within a file, or something like

15   that, without tethering that to issues that are relevant

16   to the matters in the case is neither a request that is

17   relevant, nor is it proportional to the issues in the

18   case.

19        And so as a starting standpoint there, judge,

20   that's our view that the request -- or that the judge's

21   ruling very properly determined that there was not

22   relevance and proportionality simply by asking for these

23   documents within these custodians for a particular date

24   range that just have those two names.

25             THE COURT:  In fairness to plaintiff, that's

```
 1    not what the request says.  It says plaintiff's first
 2    name or last name, excluding hits that were part of
 3    group communications and outside certain date ranges.
 4              MR. HEDICAN:  Correct.
 5              THE COURT:  Okay.
 6              MR. HEDICAN:  But no further relevance
 7    beyond that, judge.  And so what, he was employed for us
 8    for approximately 11 months?
 9              THE COURT:  Right, which is a really short
10    time.
11              MR. HEDICAN:  It is a short time but --
12              THE COURT:  Okay.
13              MR. HEDICAN:  -- but the request is within,
14    at least with respect to one of those two, I think it's
15    the latter, was for the entire stretch of his
16    employment, a little bit beyond that, and then the other
17    was for pretty much his whole employment during 2016.
18         So I think, in terms of the Judge O'Hara's
19    decision, it squares with law.  There is no -- it is not
20    clearly erroneous or contrary to the law when you have a
21    request that places no further limitations beyond that
22    date, some custodians, and then first and last name of
23    the individual.
24         And so what we -- what we did in that context,
25    judge -- and I believe our objection just delineated
```

 1  what I'm articulating for you right now that the

 2  problems -- our concern with it was that was asking for

 3  things that many of which would not have any relevance

 4  to the case.  Most e-mails, particularly in

 5  single-plaintiff cases, are not relevant to the dispute.

 6          THE COURT:  Well, first of all, your

 7  response doesn't say anything at all about your

 8  methodology for searching.  All it says, in response to

 9  No. 8, is objection and how the request could be this,

10  it could be that, it could be privileged, et cetera.

11  And the same thing with regard to No. 9 except it says

12  that you will produce non-privileged communications.

13  See privilege log.

14          MR. HEDICAN:  Judge, we responded in an

15  interrogatory that was addressed to us that asked for

16  what we did to search.  And there's, you know, a pretty

17  extensive table that outlines the dates and the terms

18  and matters that we searched, and that response was

19  provided with a document production response.  And so

20  that information was certainly conveyed to counsel as

21  far as how we did this.

22          In addition, we certainly had discussions on the

23  phone about how we did this.  And so we searched the

24  terms that they asked for and then I had a number of

25  people in my organization review those e-mails to

1   identify those that were responsive to the request that

2   have been submitted and then in addition to the issues

3   of the case.

4        Beyond that we also used a number of search terms

5   that were targeted to the issues in this case because we

6   wanted to see if there were other ways, you know, to

7   pull that, and we searched that as well.  And so we

8   undertook a great deal of effort.  As my declaration

9   indicated, we spent in excess of 200 hours reviewing

10  e-mails and going through these things to provide the

11  things that were responsive to the plaintiff.

12       Now, where we differ is that plaintiff believed

13  that if any of those document requests came up with

14  Randy or Russell other than the -- the limitations you

15  just read, judge, he should get those.  In our view, and

16  Judge O'Hara agreed with it, we don't have to do that.

17            THE COURT:  Why do you care?

18            MR. HEDICAN:  Why do we care?

19            THE COURT:  Yeah, why do you care?

20            MR. HEDICAN:  Number one, Mr. Russell --

21            THE COURT:  And as part of that isn't -- if

22  there's undue burden, isn't it self-imposed by you going

23  through and reading all those and making decisions about

24  which ones you want to produce?

25            MR. HEDICAN:  Well, judge, from our

1   standpoint we should not have to produce the e-mails --

2   just any e-mail that -- that he wants.  In terms of --

3   for example, if we were back in the days of print, if

4   somebody sent a request and said I want every letter

5   that I sent or every letter I received, that would --

6   the response to that would be but what about that is

7   seeking relevant and proportional information.  This is

8   no different than in that context, judge.  And --

9            THE COURT:  Well, it depends on the issues

10  in the case.  I mean, it's not something that

11  categorically is okay or not okay.

12           MR. HEDICAN:  Oh, I understand what you're

13  saying.  I wasn't tracking with you that as a bright

14  line rule there could be circumstances in which that

15  would be okay.  Is that what you meant?

16           THE COURT:  Right.  Right.

17           MR. HEDICAN:  Yeah, this is a

18  single-plaintiff case involving issues of retaliation.

19  And I don't think this is that case where we should have

20  to turn over, for an individual who was the human

21  resources business partner dealing with employment

22  issues for other employees of various kinds, that we

23  should just have to give over those documents just

24  because his name appears in them, and that's why we

25  reviewed the documents.

18-2144  Russell v Kiewit, et al  7.15.19                    12

1            In addition to the fact that there's always a

2       concern, I don't have any clients that I'm aware of that

3       are indifferent to turning over documents, especially

4       dealing with personnel positions extensively, that are

5       beyond what are relevant to the issues at large in the

6       case.  And so from that standpoint, again, I don't think

7       that Judge O'Hara missed the mark in terms of this

8       being -- a lot of this request being irrelevant and not

9       proportional.

10            THE COURT:  Why did you only search the

11      Mimecast?

12            MR. HEDICAN:  The Mimecast system was the

13      complete set of -- of e-mails that existed for each

14      custodian.  In other words, as we explained in the

15      declarations, the Mimecast system was -- was it.  It's

16      got everything.  Once -- and our system at our law firm

17      uses Mimecast, captures every e-mail.  There's nothing

18      that a user could do -- any of the users, any of the

19      custodians could do to delete or impact that.  And so

20      therefore we then have the Mimecast system to go back

21      and search, and that's the most efficient and the most

22      complete way of searching those e-mails.  If you were to

23      search other e-mail sets, they would be less complete

24      and it would be a duplicative effort.

25            THE COURT:  But what about things other than

1  e-mail?

2         MR. HEDICAN:  We did -- we did search -- so,

3  for example, we requested to determine whether he had a

4  Share Point file.  He did not.

5         We also went to the individual -- individuals

6  that have been named in this case and other individuals

7  and asked about materials that they had that would be

8  responsive to the request.

9         We -- we received -- I was with Mr. Jennings when

10  he pulled his file on the stock selection plan, and we

11  copied to a USB right there.  And so we retrieved that.

12         I asked the two individuals that I met with --

13  after we had previously asked about responsive

14  documents, I checked their phones to see if they had

15  text communications with Mr. Russell.  There would be no

16  purpose to search for e-mails on that, again, because

17  the synchronization would be to Mimecast.  So the search

18  of Mimecast would, in fact, pull any responsive e-mails.

19         THE COURT:  Right.  So you're saying out of

20  all of the -- what is it, 11 people that were possible

21  subjects, you asked them -- three of them about cell

22  phone records?

23         MR. HEDICAN:  So -- so it was broader than

24  that.  But we asked them specifically about the

25  individual defendants and then Andy Edsen who was also

1    listed there.  I think he was in No. 9.  We did ask

2    them -- all of them if they had responsive information.

3    There were others on that list that I also talked to

4    that are still employees of the organization.  Beyond

5    that, the ones that were -- you know, we couldn't ask

6    that were not -- were no longer working for us.

7              THE COURT:  So in 25 words or less, what did

8    you do other than look at Mimecast?

9              MR. HEDICAN:  We imaged the cell phone and

10   gave an unfiltered copy.

11             THE COURT:  The plaintiff's cell phone?

12             MR. HEDICAN:  The plaintiff's cell phone,

13   yes.

14             THE COURT:  Okay.

15             MR. HEDICAN:  We also imaged and searched

16   the laptop of Mr. Hefley, who is the decision-maker, and

17   provided responsive documents to that.  We imaged the --

18   or searched the Hefley data other than the e-mail,

19   because we already searched that in Mimecast, and

20   produced documents.

21        We went through paper documents and also

22   requested from various individuals to provide us things

23   that were responsive.  And then there were contacts that

24   we asked for various things that were responsive to

25   other requests such as policy documents and comparator

1    information personnel files.

2          THE COURT:  So how many other people had

3    laptops besides Mr. Hefley?

4          MR. HEDICAN:  I'm sure Mr. Flickinger.

5    Mr. Jennings had a laptop.  Mr. Edsen had a laptop.

6          THE COURT:  You didn't image their laptop or

7    look at them?

8          MR. HEDICAN:  We did not image their laptops

9    or look at them, but we asked to look and identify

10   documents that would be responsive.

11         THE COURT:  So you're just relying on their

12   hearsay, their reports?  I mean, why did you treat

13   Mr. Hefley different than those others?

14         MR. HEDICAN:  We felt that was appropriate.

15   Originally we had declined to do that, judge.  But

16   because he was the decision-maker whom plaintiff

17   contended he had made complaints to and ultimately, you

18   know, communicated his termination, that that would be

19   an appropriate individual to go ahead and image his

20   laptop and then search that because that would be the

21   most probable.

22        Mr. Flickinger is very far removed from him.

23        Mr. Jennings -- he did support Mr. Jennings but,

24   again, his interactions with him were not to the extent

25   of Mr. Hefley, and he wasn't the decision-maker.  And,

1  as I said, I was with him and asked that question and he

2  -- he provided a file for -- for things that were

3  responsive.

4              THE COURT:  So you asked these defendants --

5              MR. HEDICAN:  Correct.

6              THE COURT:  -- and you took their word for

7  it and let it go?

8              MR. HEDICAN:  Yeah.  Judge, I mean, they

9  have -- we all, in the context of litigation, have the

10  obligation to the court and opposing counsel to be

11  honest in terms of our response.  We certainly are never

12  perfect, judge, but there's always an element of trust.

13      I can tell you my experience in single-plaintiff

14  cases, we just -- the prospect of imaging and searching

15  multiple laptops is just not something that occurs,

16  especially when the lion's share of communication occurs

17  in e-mail and we --

18              THE COURT:  Of course you didn't say any of

19  that.  You didn't object on the grounds it would be too

20  burdensome to search individual laptops and cell phones

21  and explain the details of that.  There's zero in your

22  objection that's not boilerplate.

23              MR. HEDICAN:  Well, judge, I think, in terms

24  of our response on that, that what we indicated is that

25  what we -- what we had done, in terms of looking at

1    these issues, was we had responded to the request.  We

2    had requested those devices, that that information be

3    looked at.  Judge O'Hara --

4             THE COURT:  I'm not sure what you're

5    referring to because it's not in your response to the

6    document production request.

7             MR. HEDICAN:  In terms of -- well, I think

8    -- I thought we indicated in there, judge, that we -- we

9    had provided --

10            THE COURT:  I mean, you can look.  I can

11   give you this or you might have something else, but it

12   says, "Defendants' object --" this is in response to

13   No. 8 -- says, "-- overly broad, unduly burdensome and

14   not proportional to the needs of this case.  It seeks

15   all the communications without regard to whether the

16   communications are relevant to the dispute.  Defendants

17   further object the request could be construed to lead to

18   the production of documents protected by privilege,"

19   blah, blah, blah.  "The request could also encompass

20   issues concerning non-party employees who were the

21   subject of communications between the requested

22   individuals.  Subject to and without waiving these

23   objections, see No. 9 -- response to No. 9."

24        Then No. 9 basically says the identical thing

25   except it says, "Subject to and without waiving these

 1   objections, defendants will produce responsive

 2   non-privileged communications as described in its

 3   response to Interrogatory No. 9.  See privilege logs for

 4   documents withheld on privilege.  Defendants will

 5   supplement with additional responsive documents to the

 6   ESI search as it completes it."

 7           MR. HEDICAN:  You're correct that doesn't

 8   state that.

 9           THE COURT:  That doesn't tell me anything

10   really that's helpful in terms of understanding

11   proportionality or burdensomeness.  Therefore, to the

12   extent Judge O'Hara found that there was undue burden or

13   lack of proportionality, I'm not seeing where in the

14   record he would base that finding from a properly lodged

15   objection.

16           MR. HEDICAN:  Judge, I mean, I think, in

17   looking in the context of what the issues are, because

18   again his ruling was -- was within the strictures of the

19   criteria, we got to look at what the case is about and

20   what the requests are in context of that case.

21       This is a retaliation case alone, not underlying

22   discrimination case.  And so it's -- what operates or is

23   the critical part of that is their protected opposition

24   activity, which is what's alleged here, not

25   participation, and then a causal connection between that

1    opposition and termination.

2          So in that context, we searched 11 custodians,

3    which is a huge number of custodians to review, for

4    their e-mail from the Mimecast system.  So it was all

5    the e-mail that existed, and that's searching all of

6    that communication.  Anything that would be on the

7    laptop, judge, in terms of e-mails or something along

8    those lines, it would be entirely duplicative of what

9    was on the Mimecast or a lesser set to the extent there

10   were synchronized e-mail on it.  So we had the e-mail.

11   The work we did captured all of the e-mail in these

12   particular circumstances.

13         Mr. Russell's phone was provided to him,

14   unfiltered data for him to take a look at.  Beyond that

15   we asked the individuals if they had text messages on

16   their phones.  They informed us they did not.  I had

17   phones shown to me that did not have them on it.

18         So to go and image the phone or the laptops, et

19   cetera, in the context of this record, I think what

20   Judge O'Hara concluded is that enough effort in this

21   case has been done to identify and capture the

22   communications that are at issue.  We could image a lot

23   of laptops, search e-mail and it's not going to turn up

24   anything that's different than what we've already come

25   up with in Mimecast, judge.

1          THE COURT:  So I agree with you that that's

2     what Judge O'Hara did, but I'm looking for something in

3     the record that would support his conclusion.  I mean,

4     just saying, well, this is only a single-plaintiff case

5     doesn't take me very far.

6          I went back to the complaint, tried to see what

7     kind of relief plaintiff was seeking, and that's not

8     very helpful because it says damages and attorney's fees

9     and reinstatement.  So that doesn't tell me anything

10    about the dollar volume of this case in terms of

11    proportionality.  And what other measure would you apply

12    here?

13         MR. HEDICAN:  Well, I think in terms of

14    what's in the record, I mean, we provided my declaration

15    and the declaration of one of the Kiewit employees

16    indicating what we had looked at and the extent of the

17    searches in Mimecast and the amount of hours that were

18    put into this effort.  I think that that -- that

19    demonstrated that a large amount of effort had been put

20    into this process, judge, to identify any e-mails that

21    would be relevant on this issue.

22         The cell phone had been searched for Randy

23    Russell.  And so beyond that, those are not things that

24    are going to yield additional payoff because we -- we've

25    communicated to Judge O'Hara in those materials, look,

1   we've looked for all the e-mail.  We used all their

2   terms.  We used additional terms and it's not there.

3   And for us to have to go search other devices then in

4   looking for e-mails that would have been within the

5   Mimecast data set --

6              THE COURT:  We're not talking about other

7   e-mails though.  We're talking about things specifically

8   other than e-mails.

9              MR. HEDICAN:  Correct.  But it is a

10  retaliation case in which the operative issue was there

11  opposition.  And so that is going to -- that's -- in

12  terms of documentation, it's communication, judge.  And

13  that's going to be e-mails and that's going to be texts.

14  And so we -- we've undertaken that effort to identify

15  those things and that's in the record.  That's what the

16  judge had.

17             THE COURT:  And what is there in the record

18  about undue burdens or proportionality?

19             MR. HEDICAN:  Well, certainly the amount of

20  effort that went into just looking for the e-mail,

21  judge, just the effort that we did to pull, host, search

22  and review the e-mail was a substantial amount of

23  effort.  So that alone demonstrates the expenditure that

24  we went through to be responsive to these discovery

25  requests.

18-2144  Russell v Kiewit, et al  7.15.19                    22

1          To then take an additional step and do these

2     additional things, judge, is just -- it's going to --

3     it's obvious from the materials in there that that will

4     incur additional expense, either add or -- of some

5     magnitude.

6               THE COURT:  So the number I saw was

7     210 hours and $4,650 in costs; is that it?

8               MR. HEDICAN:  It was -- yeah, that's the

9     hosting cost and then there were attorney's fees billed

10    for that time.

11              THE COURT:  And that doesn't strike me as

12    particularly onerous.

13              MR. HEDICAN:  In a single-plaintiff case,

14    200 hours on electronic discovery is a substantial

15    amount of time.

16              THE COURT:  Okay.  Let me hear from

17    plaintiff on this issue before we go on to the next

18    ones.  Thank you.

19              MR. HEDICAN:  You bet.  Thank you, judge.

20              MR. REAVEY:  May it please the court, judge,

21    Patrick Reavey again on behalf of plaintiff,

22    Mr. Russell.  And, judge, I would just start by

23    indicating I brought Mr. Russell here.

24          I think you know one of the big sort of picture

25    things in this case is each and every document we've

1    received from defendants in discovery we've sent to

2    Mr. Russell.  And Mr. Russell will tell the court, has

3    indicated over and over again that there are protected

4    e-mails and text messages that he exchanged, not just

5    with Mr. Hefley but also with Mr. Jennings and others,

6    that just have not been produced.

7          And we were -- we were excited, when months and

8    months after we were told in response to our discovery

9    requests that Mr. Russell's cell phone had been

10   destroyed or gone, that the cell phone had been

11   discovered.  And it is true that Mr. Russell traveled to

12   Omaha where Mr. Hedican has a gentleman that he uses for

13   IT things and that's who had the phone.  Mr. Russell

14   took a day off work, traveled to Omaha and looked

15   through the e-mails.  Well, and, again, you know, the

16   report from Mr. Russell is there's nothing there.

17         And we now have been told by our -- our IT

18   expert, John Mallory, that because this IT consultant in

19   Omaha, because he did an iTunes backup of the cell

20   phone, that was his first step, that it erased any

21   synced data for anything pointing to the cell phone.

22   There's nothing there.  There's no data, practically

23   speaking, on the cell phone.  So that certainly is not

24   something that's useful for the plaintiffs.

25         And then I think another important point I'll

1   just display here, this is an attachment to our

2   briefing.  But we see here on April 22nd, 2016, the day

3   of Mr. Russell's termination, that Mr. Hefley was

4   getting access to his e-mail and he was given a .pst

5   file of Mr. Russell's e-mail.

6        And, you know, there's been so much about

7   Mimecast, judge, but I think it's important to point out

8   that Mimecast has not been searched.  What has been

9   searched and what has been repeatedly pointed to by

10  Mr. Hedican as this "Mimecast data," that data that was

11  searched simply is an extract from that Mimecast system

12  and that extract was done long after Kiewit knew

13  Mr. Russell was pursuing legal claims.

14       So, you know, I don't know if it's -- this is

15  something Mr. Hedican can get in touch with Mimecast to

16  get access to the raw data, but we're starting from the

17  standpoint of data put together by Kiewit after they

18  were well aware of Mr. Russell's legal claim.

19       And I think it's important to point out that

20  Mr. Russell's legal claim is different than your normal

21  discrimination claim where there's usually a lot of

22  evidence.  Mr. Russell's claim lives or dies on whether

23  he engaged in protected activity, and that's what we're

24  trying to get.  And as discovery has ticked along, just

25  to give you an example, unfortunately I have partly come

1    to the conclusion, I guess, we'll have to develop this

2    through testimony witnesses.

3         So a week and a half ago I reached out to a

4    fellow HR person that worked with Mr. Russell.  And she

5    -- she no longer works at Kiewit but she seemed to be

6    wanting to be helpful.  She told me that, hey, you know,

7    if you don't mind, just call me in the evening when I'm

8    not at work; I'll be happy to talk to you.

9         When I reached back out to her to have that

10   conversation with her, she sent me a text indicating,

11   well, is it okay if we arrange things so Kiewit's

12   counsel can be on the phone when we talk, which I guess

13   is fine.

14        But my point being, we feel like Kiewit has a

15   tight rein on any information that comes to plaintiff,

16   and that's not the purpose of discovery.  As we all

17   know, the purpose of discovery is to put everything out

18   on the table.  And we feel like we've tried to do that

19   even at the Request 8 and 9 --

20             THE COURT:  Okay.  Let's talk specifically

21   -- okay.  I think you're making that segue, but I --

22   you're sounding more like a closing argument --

23             MR. REAVEY:  Sure.

24             THE COURT:  -- than analysis which directly

25   addresses the paragraphs 8 and 9 of the request.

1          MR. REAVEY:  Yeah, judge, I would point out,

2    on those requests, we footnoted those requests

3    indicating we were happy to confer with Mr. Hedican upon

4    his receiving the request if he felt like they were too

5    unwieldy or they would yield a bunch of irrelevant

6    documents.  We were happy to talk to them.  That goes on

7    in many cases.

8          But, as we understand it, what we're -- sort of

9    the data set that was started with was 70,000 e-mails.

10   And we don't know if that's with attachments or without

11   attachments, but that 70,000 was developed by

12   Mr. Hedican or Kiewit.  And we understand that to be the

13   entire universe of every e-mail that Mr. Jennings sent

14   or received.  So it's the big global thing.

15         When he applied our search terms, that narrowed

16   it down to 9,000 e-mails.  And we feel -- I mean, I

17   really don't want to go through 9,000 e-mails, but we

18   feel like there's no valid excuse for not turning over

19   those 9,000 hits to us as being responsive to our

20   document request.

21         And Mr. Hedican has not even shared, like, the

22   methodology that he or Kiewit went through to narrow

23   that 9,000 down to the 700 e-mails we received.  And we

24   feel that's -- you know, that's -- the whole point of

25   the request, as you can see, is to get around, you know,

1   filtering by lawyers or parties.

2        We just feel like -- to me it's similar to a

3   personnel file.  As we all know, a personnel file

4   represents the entire employment of an employee and many

5   documents in a personnel file may not be directly

6   pertinent to an issue in the case.  But it's well

7   understood in this district that personnel files are

8   discoverable and we feel like, you know, those search

9   terms that we, you know, had are similar.

10       And if I can just point out one other thing,

11  judge.  And I've marked this as Exhibit 2 and I've asked

12  Mr. Hedican -- I don't believe he has any objection to

13  it, but I'd move to admit Plaintiff's No. 2.

14            THE COURT:  What is it?

15            MR. REAVEY:  It is a document produced by

16  defense counsel in this case.  And I can go ahead and

17  tell you the point I'm trying make.

18            THE COURT:  Any objection?

19            MR. HEDICAN:  No.  We offer -- we put it in

20  with our opposition materials on the motion to compel.

21            THE COURT:  What's the date?

22            MR. HEDICAN:  I think February 22nd or 23rd.

23            MR. REAVEY:  February 23rd, 2016.

24            THE COURT:  Okay.

25            MR. REAVEY:  So, judge, the thing I wanted

1    to point out is if you look to see this first page that

2    has the exhibit sticker, that encompasses the -- what

3    appears to be the entire e-mail.  And based on when this

4    produced, this would have come from Mimecast, this

5    e-mail.  Months and months later we were then told that

6    Mr. Hedican was searching the laptop of not only the

7    plaintiff but of Mr. Hefley.  And, in questioning

8    Mr. Hedican about that search, it was indicated that

9    they did not search for any e-mails on either one of

10   those laptops because in their mind it was duplicative

11   of the Mimecast.

12        But this document that's Bates stamped 5830 that

13   was produced within the last few weeks as something

14   found on, I presume, Mr. Hefley's laptop but here we --

15   this is the same e-mail that you just saw a moment ago

16   dated February 23, 2016, but on this e-mail all of the

17   data is erased from the e-mail, at least that's what

18   appears to us.

19        So, again, it's just another question raised

20   about, you know, we were told e-mails were not searched

21   of these two laptops from the mirror image.  So, you

22   know, why was this document produced and why is the data

23   erased from it?

24        If you look at the data, judge, it does appear to

25   -- and I'm speculating in a way.  But when you read it,

1   it appears that it could be construed as some type of

2   protected activity.  It is not.  I mean, a lawyer's eyes

3   on this would quickly tell you this is not protected

4   activity because it's not complaining of legally

5   protected rights.  But, again, it's just another

6   question about the searches that were done and the

7   information that we had been provided.

8          So I'll stand for any other questions you have.

9          THE COURT:  So what did you mean when you

10  said Mimecraft (sic) has not actually been searched?

11         MR. REAVEY:  Judge, it has not.  The --

12  Mimecast -- a year after Mr. Russell was terminated, the

13  ESI disclosures filed by defendants has indicated that,

14  well, we decided to stop using Mimecast, so we went --

15  we underwent this project of only on people that had

16  legal holds.  So if a person was designated as an active

17  legal hold, on those selected people Kiewit extracted

18  data from Mimecast and moved it over to some other

19  database that they use.  And so I think defense counsel

20  agrees that the notion that Mimecast has been searched,

21  just that didn't happen.

22         And I agree if Mimecast was still in existence,

23  what I know about the system, it would seem to be a

24  reliable source.  But the fact is the searches have been

25  done.  And that's important, judge, because in the

1  briefing we've indicated we've asked for contemporaneous

2  information about just give us a document that shows us

3  who was on this active hold, meaning who was subject to

4  these extracts of -- you know, at the time this extract

5  was done, and defendants have refused to give us that

6  information.  So even in the ESI disclosures that were

7  submitted to the court, Randy Russell is not listed as

8  someone being subject to a legal hold.

9      Now Mr. Hedican after that has said, well, he

10  was.  It just -- yes, he's not on the list but those

11  disclosures have never been updated.  And we have

12  nothing to point to to say that in fact Mr. Russell was

13  on hold when Mimecraft (sic) was in existence and all of

14  his data was extracted over, and that's true of all the

15  other individuals that you questioned defense counsel

16  about.  We have nothing.

17      And, in the conference call that we had with the

18  gentleman who said that he was the project manager, it

19  was clear in the, I believe, formal discussions that

20  there was a list.  Meaning I understood it as being

21  there's a paper list of people on active holds.  And I

22  simply asked, as part of that conference, Mr. Hedican,

23  can you get me, like, a native copy of that list so we

24  can ensure that Mr. Russell and others in fact were on

25  that legal hold before this extract happened.  And

31

 1  Mr. Hedican has not -- has refused to produce that.

 2       The only information he said was on May 26th --

 3  May -- I think -- well, I think it's several months

 4  after Mr. Russell was terminated Mr. Hedican indicates a

 5  legal hold was put in place on that day.  But again it's

 6  just, you know, representation of defense counsel.  We

 7  have nothing further than that.  So...

 8            THE COURT:  Okay.  So just so I understand,

 9  so you had Document Production Requests 8 and 9 that

10  defendant ran those requests through Mimecast and got

11  9,400 approximate hits.  And then of the -- and the

12  screen was based on your document production request.

13  But then they produced 775 approximate documents; right?

14            MR. REAVEY:  That's correct.

15            THE COURT:  And what is the criteria by

16  which defendant decided not to produce the other 8,600?

17            MR. REAVEY:  Okay.  His informal discussion

18  with us has been that what he did was looked at the

19  remaining discovery requests that we had served in the

20  case and made an independent determination of, you know,

21  if documents were flagged or were hits but did not --

22  were not directly responsive to any of our other

23  discovery requests, and in his mind they didn't have to

24  be produced.

25            Now, Mr. Hedican is also, as the briefings went

1    on, indicated, well, we also, if it was clear that it

2    wasn't pertinent to a quote/unquote an issue in the

3    case, that was, as I understand it, another filter that

4    they used to say, you know, Reavey doesn't need to have

5    this.

6         So I think it was important, as I did early on

7    when I first learned there was sort of this chunk of

8    documents we weren't given, I asked Mr. Hedican, look,

9    if these are false hits, meaning, you know, Randy --

10   thousands of documents were related to another Randy or

11   another Russell, I'm complete -- we don't want a bunch

12   of junk.  So if you can -- but the indication to me was,

13   no, that's not -- this chunk of documents that has been

14   withheld is not false hits, as it were.  They are

15   documents related to Randy Russell, but the

16   determination has been made by defense counsel that

17   they're not pertinent.

18        THE COURT:  Okay.  So let me ask

19   Mr. Hedican, 8,000 document is a lot to not produce if

20   they're squarely within the scope of the document

21   production request.  Did you file a motion for

22   protective order?

23        MR. HEDICAN:  No, we did not.

24        THE COURT:  And do you have a log of some

25   kind that would explain to me the basis for not

1   producing those?

2          MR. HEDICAN:  Well, we certainly have the

3   privilege log for what we withheld on those.  Beyond

4   that, judge, we took the -- the e-mails and reviewed

5   them just as Mr. Reavey has explained.  I also have

6   submitted that within our opposition to the motion to

7   compel.

8          The reality is that 9,000 -- there's

9   unquestionably false positives in it.  There would be

10  other documents that certainly reference Randy Russell,

11  but we did not see them as being responsive to the other

12  requests or having a bearing on the issues in dispute in

13  the case.  And when you --

14         THE COURT:  But you admit they were within

15  the scope of the request?

16         MR. HEDICAN:  There would be some that would

17  have been within the scope.  They had the word Randy or

18  they had the word Russell in there or Randy Russell.

19  And though there would be documents within that 9,000,

20  judge, that would be, but one thing I do want to point

21  out is that when you start with 11,000 custodians (sic),

22  especially in these --

23         THE COURT:  11,000 custodians.

24         MR. HEDICAN:  I apologize.  Eleven

25  custodians.  But when you start out with 11 custodians,

1   the more custodians you add, particularly as you move

2   outside from the people that are really at the heart of

3   the case, the more of those e-mails you add increases

4   the body that you have to search but it also increases

5   the number that would likely not be responsive.

6        And so bottom line is that while nominally you

7   can say it's 9,000, why is it that it pared down only to

8   that smaller number?  And, well, that's because most of

9   the e-mails in that context just are not relevant to the

10  issues that are in dispute.

11            THE COURT:  According to you.  You don't

12  have any kind of record, any kind of formal criteria,

13  any kind of documentation, okay, these were false

14  negatives because wasn't even the plaintiff, it was a

15  different Randy or a different Russell, that takes care

16  of this chunk; these others were about going to lunch on

17  Tuesday, those aren't relevant, that kind of thing?

18            MR. HEDICAN:  Well, we -- we pulled anything

19  that had to do with the selection nomination for the

20  stock plan.  If there was anything to do with Kyle

21  Kelly, that was also a set of search terms we used that

22  had not been asked for.  He was the gentleman in turn

23  Mr. Russell allegedly raised a concern about ADA issues.

24  So if we had anything on that, we went and got his file.

25  And not specifically requested, we got all those things.

18-2144  Russell v Kiewit, et al  7.15.19                    35

1        We also, if we saw anything about Jonathan Smith

2    who was an individual involved with the FMLA issue, any

3    of those issues we took.

4        If there was any complaint of protected activity,

5    anything that addressed performance, all of those things

6    were flagged in addition to other requests.  For

7    example, in calendars, you know, if there were a

8    calendar entry involving these individuals, we would

9    pull that.

10        Judge, I go back to the fact that in discovery to

11    simply ask for any document within even a narrow time

12    frame that just has your client's name on it is -- is

13    facially not a request for something that's relevant or

14    proportional in my view and I think in the view of

15    Judge O'Hara.  And I realize you're the Article III,

16    judge, your job description --

17             THE COURT:  You'll have to take it to the

18    Tenth Circuit after this, but at least you'll get three

19    people to weigh in on it.

20        I mean, I -- frankly, I just don't see any

21    other-- yes, there's nothing that says you're required

22    to produce everything that has plaintiff's name on it,

23    but there's nothing that gives you the right to decide

24    what within the scope of an otherwise applicable request

25    should be produced and shouldn't.

1            And so, like, you didn't go to Judge O'Hara,

2    said:  Oh, my goodness, we got 9,400 hits.  A lot of

3    them don't apply.  Is it okay if we just take it from

4    here?  Or did you get guidance from the court on what

5    Judge O'Hara thought you should do?

6                 MR. HEDICAN:  No, no, we didn't, judge.  But

7    in our view I thought that -- typically what will happen

8    in these cases is that you'll have search terms.  You'll

9    have custodians that everybody agrees to, and then

10   you'll do your searches.  And whatever's responsive to

11   the various requests, that you provide that.

12           What's different about this is that plaintiff set

13   it up specifically as a request tethered to the search

14   terms and said, hey, here's the search terms; if there's

15   any hit, I get it.  And that's simply not something that

16   -- that I have ever seen done in cases.

17           It's certainly not co-extensive or consistent

18   with how discovery in ESI is typically done, which is we

19   talk about search terms.  We talk about custodians.  We

20   look and whatever's there that matches up on the request

21   to provide, but not that you convert the search terms

22   and the custodians themselves into a document production

23   request, which is what we're really at here.

24           I felt that what we were doing was absolutely

25   consistent with how every other case is done, in that we

1   would provide these responses consistent with the other

2   responses to the issues in the case.  I think that's

3   exactly where Judge O'Hara landed on this, judge, is

4   that what we did here was co-extensive with what

5   everything else you would typically do in a case.

6       What's different here, Mr. Reavey said I set this

7   up for a request; if I ask for it and it has his name on

8   it, I get it.  That is broader than what is typically

9   done in discovery.

10      THE COURT:  I mean, that may be but you're

11  not the God of --

12      MR. HEDICAN:  No, I'm not.

13      THE COURT:  -- of the documents that are

14  produced.  So would you rather produce all 9,400

15  documents or would you rather prepare a log that

16  explains to me for each document that you withheld why

17  you think it's not relevant?

18      MR. HEDICAN:  Well, what I would want

19  certainly is to consult with the client on that as to

20  what they would want to do, because I think ethically I

21  have to get their direction.  If that's the option that

22  you're presenting, judge, if I -- if I'm understanding

23  you correctly, that would be something I definitely

24  would need to talk to them and see what their preference

25  would be.

18-2144  Russell v Kiewit, et al  7.15.19                    38

1            THE COURT:  I mean, I'm not exactly at that

2    point of offering that.  I'm just trying to figure out

3    where to go from here.  Because, as I said, if you had

4    made decent non-boilerplate objections, then I think

5    Judge O'Hara might have had more to work with and I

6    would have had more to work with in terms of evaluating

7    whether there's any incremental undue burden or

8    disproportionality from having you go ahead and produce

9    these, you know, additional 8,000 records.

10            MR. HEDICAN:  Judge, I -- I felt that a

11    request that just simply asked for the name -- I take it

12    that you're -- I'm not persuading you on that, but

13    that's how, when it raised our objection, it was

14    facially on this request to -- simply asked for every

15    e-mail within this confined -- this time frame that has

16    Randy Russell's first or last name on it.  That's an

17    overly -- facially overbroad and facially not

18    proportional.

19            THE COURT:  I might -- I might have more

20    sympathy for that if you could show me what you

21    eliminated from production because it was, in fact,

22    overly broad, but we don't have anything like that

23    before me except your word that you in your judgment

24    they -- the request was overly broad in this particular

25    case.

1           MR. HEDICAN:  Well, I believe the

2    declaration covers that, judge.  Because what we

3    eliminated from production was anything that was not

4    responsive to the other requests and --

5           THE COURT:  That's not -- again, that's not

6    your right to make that call.

7           MR. HEDICAN:  But I believe that we have to.

8    As counsel, we're all -- you know, if I get a request

9    that says give me the identity of these particular

10   individuals, there's a judgment made in that response

11   that -- they all have to be made in good faith, but

12   there's always judgments that have to be made as

13   counsel, judge.

14          THE COURT:  Okay.  Let's -- let's go on and

15   talk about the personal storage folders.  Again, this is

16   one that sort of left me scratching my head because it

17   seems to me that you could do this with a couple clicks

18   of a mouse and be done with it.

19          MR. HEDICAN:  Which one is that, judge?

20          THE COURT:  The .pst files.

21          MR. HEDICAN:  Entire .pst file?

22          THE COURT:  Request 29.

23          MR. HEDICAN:  Right.

24          THE COURT:  Again, Judge O'Connor --

25   Judge O'Hara said that the request was facially

1    overbroad and not proportional but --

2            MR. HEDICAN:  Judge, that request, he has

3    approximately -- there's 14,000, I think, documents

4    within that file.  That is seeking to use my earlier

5    illustration.  That literally would be a request -- is a

6    request for every letter received or written by

7    Mr. Russell, if we put it in the context of paper,

8    without any differentiating or narrowing request.

9    Nothing that says tell me -- let's limit it to something

10   that's relevant to this case.  It's just whatever that

11   guy got, in terms of an e-mail, or wrote, in terms of an

12   e-mail, during the entire tenure of his employment, we

13   get that whole thing.

14           This is an HR professional dealing with personnel

15   issues, having discussions at times with legal counsel

16   and we have to now just turn to give them the whole .pst

17   file.  I think to just simply say every e-mail I ever

18   received or ever sent without anything more is on its

19   face overly broad and not proportional.

20           THE COURT:  So did you produce anything in

21   response in paragraph 29?

22           MR. HEDICAN:  Nothing other than the

23   documents that we provided in response to (8) and (9).

24           THE COURT:  And, again, you say it's overly

25   broad, unduly burdensome, not proportional, end of

1    comment.

2              MR. HEDICAN:  Facially, judge, as I've said,

3    I don't have more to add to that piece of it.

4              THE COURT:  So you're telling me there's not

5    one single document in his files that you think is

6    discoverable?

7              MR. HEDICAN:  No because we provided some --

8    we provided e-mails.  So his .pst file is just another

9    way of saying all his e-mail.  And so the bottom line,

10   judge, that we did produce documents that obviously were

11   in that because that's what we pulled from Mimecast as

12   we did for the other custodians.  So documents were

13   produced.

14        But to say that we had to just give him his whole

15   e-mail account in essence without any further reference

16   or statement as to what is relevant, respectfully, that

17   on its face is overly broad and not proportional.  Most

18   of what will be in there is not going to be relevant to

19   the case.

20             THE COURT:  But, again, we don't -- that's

21   the same as the problem we just talked about.

22             MR. HEDICAN:  I guess, I apologize.  I'm --

23             THE COURT:  Well, that you got 9,400

24   documents and you decide which of those that are within

25   the four corners of the request you will actually

1    produce.

2           MR. HEDICAN:  Judge, this is not materially

3    different though than if counsel had served a Rule 34

4    request to inspect and walked through and be shown any

5    files or documents or anything that Mr. Russell worked

6    on and then said, "I get those."  And if I said, "Well,

7    everything whether it's -- whether it has anything to do

8    with this or not?" in his view is yes.

9           And that -- facially I don't see how -- how just

10   saying I want every document authored or received can be

11   proportional or -- or relevant in that context, judge.

12   Because what that would have to mean is it would seem to

13   me is that you would have the right to seek a .pst file

14   for most custodians that were at issue in the case

15   because there could be something in there that's

16   relevant.

17          And that's really one of the things Judge O'Hara

18   said:  Yeah, there probably could be something relevant

19   in there, but it's not saying -- without saying what

20   that is and without saying it's proportional, you don't

21   automatically get it.

22          Respectfully submit that.

23          THE COURT:  Right.  But if you're not -- I

24   feel like I'm just beating the same drum over and over.

25   Isn't the proper procedure, if you are served with a

1    response, you have documents to produce but you think

2    that they are not relevant, that you would go to the

3    court and ask for a protective order or for

4    clarification about what your obligation is?

5            MR. HEDICAN:  Well, in this text we

6    certainly objected, which is part of the procedure

7    that's available to us.  We had multiple discussions

8    about this.

9        The .pst -- the request for the .pst file, judge,

10   is, frankly, considerably broader than -- than the

11   request for -- in (8) or (9).  I mean, it goes -- it

12   goes well beyond that in that particular request.

13       I guess my feeling on it is that asserting the

14   objection to what is a facially overly broad request was

15   an appropriate response to that because there is no --

16   there is no narrowing of that.  It's just "give us

17   everything we received or that was sent."

18           THE COURT:  Okay.  Let me hear from

19   plaintiff.

20           MR. REAVEY:  May it please the court, judge,

21   on the .pst file, to be honest, part of the reason we

22   requested the .pst file was, in a different case that

23   was in front of Judge O'Hara, we had an in-court hearing

24   and sort of the same issue came up.  And Judge O'Hara's

25   comment to the defense counsel is, well, why wouldn't

1    you give the .pst file?  I mean, the plaintiff's already

2    seen everything sent out of that .pst or received, so

3    what is the big deal?  It's true in that case defense

4    counsel agreed to give it and I understand Mr. Hedican's

5    not.

6         But that would be, I guess, our biggest point is

7    that the plaintiff has already seen these materials.

8    And I, in fact, at one point offered to Mr. Hedican,

9    well, how about we'll just allow the plaintiff to review

10   it.  I won't even review the .pst file.  We'll have the

11   plaintiff himself, if you're so concerned that there's

12   some -- you know, something in there that's so highly

13   relevant.

14        But I think on top of all this we get back to the

15   fact that none of Mr. Russell's protected activity has

16   been disclosed.  So we are -- to me we're at the point

17   of it definitely seems proportional and relevant that

18   Mr. Russell be allowed to look for this protected

19   activity that he engaged in.

20        And I don't see any other way -- for some of the

21   comments you made, it's pretty clear that defense

22   counsel -- I don't know if he's reviewed the entire .pst

23   file, but according to him there's no protected activity

24   within that.  So I think it's fair that the plaintiff be

25   allowed to -- as I said, the plaintiff indicates that he

1   clearly -- you know, and he understands what protected

2   activity.  Protected activity is not just complaining

3   about, you know, some non- -- you know, protected

4   activity is fairly well-defined under the law.  And I

5   just think, in fairness, given the circumstances, we

6   ought to get the .pst file.

7          Also just wanted to point out this is Exhibit 1.

8   And, judge, these are text messages exchanged with

9   Mr. Hefley.  And these came to us just within the last

10  2-3 months long, long after our original discovery

11  request went out.  But we -- other than these text

12  messages that were produced by defense counsel -- and

13  they were produced as initial disclosures.  Because if

14  you read through here, my understanding is they are

15  trying to pinpoint that the -- the decision to terminate

16  Mr. Russell occurred not on the very day he was told he

17  was fired but two weeks prior.

18         So these -- these text messages were exchanged

19  with this Kiewit employee, Rachel Nowath.  And so

20  Mr. Hedican was able to obtain these text messages.  But

21  other than these text messages, there's not a single --

22  not one text message produced in discovery from

23  Mr. Russell's phone or from any of the defendants'

24  phones.

25         So we think that's an important observation that,

 1   I mean, surely that's not the case that there's not a

 2   single text message responsive to our request.  And I

 3   think we would know that if we knew that searches were

 4   done of these personal devices.  It may turn up that

 5   that's true.  But just asking people we don't feel is

 6   thorough.

 7        And I'd move to admit Plaintiff's Exhibit 1 that

 8   I've already shared with Mr. Hedican.  They produced it

 9   in discovery.

10             THE COURT:  Any objection?

11             MR. HEDICAN:  Yeah, I have no objection,

12   judge.

13             THE COURT:  I think it's attached to your

14   briefs.  I've seen it before.

15             MR. REAVEY:  Thank you.

16             THE COURT:  Okay.  What about document

17   production No. 4, 23 and 24 having to do, I think

18   principally, with other defendants who are allegedly

19   joined or integrated employers?

20             MR. HEDICAN:  Judge --

21             THE COURT:  Let me just ask a question

22   first.  So it's my understanding that plaintiff did work

23   for all of the -- at least the allegations of the

24   complaint are the defendant did work for each of the

25   different corporate entities that are named as

```
 1    defendants?

 2              MR. HEDICAN:  He was employed by Kiewit

 3    Energy and in -- as an employee of Kiewit Energy.  He

 4    was the human resources business partner exclusively

 5    assigned to support Kiewit Power.  Those two entities

 6    are named.  The others -- so he was not an employee of

 7    Kiewit Power.  He did support Kiewit Power.

 8              THE COURT:  And Kiewit --

 9              MR. HEDICAN:  He was an employee of Kiewit

10    Energy.

11              THE COURT:  Okay.

12              MR. HEDICAN:  Judge, one thing I wanted to

13    say:  There were e-mails -- or text messages in

14    Mr. Russell's phone that were in the phone data that we

15    provided.  So in -- in answering your question on (23)

16    and (24), in this particular case Mr. Russell is

17    supporting Kiewit Power.  Kiewit Power was making

18    determinations -- and I assume you're talking about the

19    stock plan at this juncture or...

20              THE COURT:  Well, anything within the scope

21    of document production 4, 23 or 24.

22              MR. HEDICAN:  Okay.  So I think that that

23    covers the stock plan as well as I think the complaints.

24    I think that's the other one that's in there.

25              THE COURT:  All right.  (24) is the stock
```

18-2144  Russell v Kiewit, et al  7.15.19                    48

```
 1    plan, (23) is stock plan, and (4) is -- I think that

 2    would be people who were terminated --

 3              MR. HEDICAN:  Yeah.

 4              THE COURT:  -- in the last five years that

 5    worked in HR.

 6              MR. HEDICAN:  All right.  So in terms of

 7    (4), we have provided the personnel -- I think that's

 8    the one that we're talking about.  We provided the

 9    personnel files for individuals that were terminated out

10    of Mr. Russell's employer, which is Kiewit Energy.

11    That's where Mr. Hefley, the decision-maker, worked.

12         None of those individuals were -- he wasn't

13    involved with their terminations.  There was -- we did

14    provide information on one of the responsive topics for

15    Mr. Hefley, that was where an individual had raised an

16    issue.  Then we checked with the other individual

17    defendants.  They didn't have anything responsive, but

18    we did provide personnel files for the Kiewit Energy

19    terminations.

20              THE COURT:  So you're saying Hefley was the

21    sole decision-maker?

22              MR. HEDICAN:  Yeah, he was the one who made

23    the decision.

24              THE COURT:  And is that stipulated?

25              MR. HEDICAN:  You mean --
```

```
 1              THE COURT:  Does everybody agree he was the
 2   only decision-maker?
 3              MR. HEDICAN:  That's correct.
 4              THE COURT:  Is that right?
 5              MR. REAVEY:  That is not correct, judge.
 6              THE COURT:  That's not what the complaint
 7   alleges.
 8              MR. HEDICAN:  I'm sorry, judge, I thought
 9   you meant from our perspective.  You're asking did
10   Mr. Reavey agree to that?  No.
11              THE COURT:  Right.  Okay.
12              MR. HEDICAN:  Obviously they would have
13   known -- I presume they would not have named two
14   individual defendants that they did not believe would be
15   accountable for the decision.
16              THE COURT:  Right.  So did you look for
17   responsive documents from other companies besides Kiewit
18   Energy?
19              MR. HEDICAN:  No, judge, just for Kiewit
20   Energy because that involved Mr. Hefley -- I take that
21   back.  We did ask -- Mr. Jennings and Mr. Flickinger
22   were also named.  We asked if there were any complaints
23   against them.  And if there had been, we would have --
24   complaints or terminations, we would have -- would have
25   provided that.  But I believe the request is limited to
```

1   HR personnel.

2            THE COURT:  I think so.  So -- I'm sorry, so

3   why were you looking for Mr. Hefley's personnel file?

4            MR. HEDICAN:  We -- we produced the -- the

5   personnel files for HR personnel and Kiewit Energy, the

6   unit that Mr. Russell worked in, for terminations for

7   other HR people.

8            THE COURT:  Okay.

9            MR. HEDICAN:  So we did provide that.

10            THE COURT:  Okay.  And were there any?

11            MR. HEDICAN:  Were there any?

12            THE COURT:  Uh-huh.

13            MR. HEDICAN:  We produced something like 7-8

14   files, something like that.

15            THE COURT:  So you're saying that for the

16   other defendants there were no terminations?

17            MR. HEDICAN:  For, like, Kiewit -- no, we

18   didn't -- we did not provide -- we did not provide HR

19   personnel termination files for people outside of Kiewit

20   Energy.  Mr. Hefley didn't work for that company -- or

21   for those entities, and the individuals that were

22   alleged to be involved in his termination did not work

23   for those entities.

24            THE COURT:  So you're saying that -- so

25   these other individual defendants -- so plaintiff's

```
1   theory is that they were also decision-makers even
2   though they may have worked for other corporate
3   entities; right?
4            MR. HEDICAN:  Correct.
5            THE COURT:  And you're saying that documents
6   with regard to terminations in their companies don't
7   exist or that you didn't look or that you looked and
8   didn't produce them?
9            MR. HEDICAN:  Well, as far as complaints
10  against -- against those individuals, Jennings and
11  Flickinger, we asked.  There were not, you know, people
12  who made complaints against them.  We did not.
13           THE COURT:  That's not what the request
14  says, I don't think.  It's --
15           MR. HEDICAN:  I'm probably conflating one of
16  the other requests.
17           THE COURT:  HR employees whose employment
18  ended within the last five years and during the
19  three-year period preceding their employment ending they
20  provided HR resources to or consulted about HR issues
21  with individual defendants or Andy Edsen.
22           MR. HEDICAN:  Correct.  So my -- those
23  individuals that HR support, to my knowledge, would have
24  come out of Kiewit Energy for those individuals, and we
25  provided that information.  And we did not provide that
```

1   for, you know, Kiewit Corporation, or I can't remember

2   the other name for one of the corporate entities that

3   were sued.  So I believe we provided that responsive

4   information, judge.

5           THE COURT:  So you didn't provide it for

6   anybody except Kiewit Energy?

7           MR. HEDICAN:  Right.  But the HR people that

8   would have supported those individuals were in Kiewit

9   Energy.  So I think the request is limited to those

10  individuals providing support to Flickinger and Jennings

11  and Edsen.

12          THE COURT:  Okay.  Do you agree with that,

13  Mr. Reavey?

14          MR. REAVEY:  No, judge, I don't know that to

15  be true.  I apologize that was -- I just don't have the

16  -- I haven't been provided anything that indicates that

17  the individuals that Mr. Hedican just mentioned, that

18  they would be the only people associated with the other

19  defendants.  I just don't have that -- that knowledge.

20  That's just something we've heard from Mr. Hedican,

21  again that.

22      But our big understanding was that there was not

23  discovery looked for as to any defendant that was not in

24  the consideration of Mr. Hedican and his client.  If

25  Mr. Russell was not their quote/unquote employee, then

1    the discovery as to those other entities did not have to

2    be responded to.  That's our understanding of how it was

3    dealt with.

4              THE COURT:  All right.  I'm hearing

5    something different, which is that all of the HR support

6    requests would have gone to HR at Kiewit Energy.  Is

7    that what you're saying?

8              MR. HEDICAN:  That --

9              THE COURT:  And so if you produced discovery

10   relative to Kiewit Energy, that would cover HR issues or

11   investigation files from whatever source?

12             MR. HEDICAN:  Yeah, the Kiewit Energy Group.

13   As I said, Randy's an employee of Kiewit Energy but he

14   supported Kiewit Power.  That's Flickinger.  That's

15   Jennings.  That's Edsen.  Hefley is employed by Kiewit

16   Energy.  We didn't go look at all -- we didn't look at

17   Kiewit Corporation.  What I would be willing to do is

18   double-check on that, judge.

19             MR. REAVEY:  May I say one other thing?

20             THE COURT:  Sure.

21             MR. REAVEY:  We -- I have had discussions

22   with Mr. Hedican, and I think he can share with the

23   court there is a sort of large overarching HR department

24   in Omaha at Kiewit's headquarters and that's the case

25   with most companies that, you know, we have cases.

1           And so that's what I've been pressing Mr. Hedican

2    that, look, we're entitled to, you know, the overarching

3    HR.  That's how most companies -- and Mr. Hedican has

4    been very diligent about no, no, no, the HR -- there was

5    a separate HR quote/unquote department that resided in

6    Lenexa and that's what you're limited to, and that's

7    essentially what we object to.

8           We think it's fair that the -- just like with

9    most companies, the overarching HR department, since we

10   are dealing with an HR employee, that that should be the

11   source of responding to discovery, not some, you know,

12   sub-HR department in Lenexa that Mr. Hedican believes is

13   the more pertinent place to look for things.

14           MR. HEDICAN:  Judge, they might -- Kiewit

15   Energy was developing as a shared service.  So a lot of

16   the company-wide HR services emanate from that.  I think

17   the request was -- was for the HR individuals that

18   supported those particular folks, and those people would

19   have come from Kiewit Energy.  I am willing to check and

20   just confirm that, that there's not somebody who was

21   employed in one of the other units, but I'm pretty

22   confident that was not the case, meaning was there

23   somebody in Kiewit Corporation that supported one of

24   those individual defendants that lost their job.  But

25   essentially the relevant people are in Kiewit Energy.

18-2144  Russell v Kiewit, et al  7.15.19                           55

1           THE COURT:  But so I -- what's the

2  relationship between Kiewit Corporation and Kiewit

3  Energy?

4           MR. HEDICAN:  Well, so Kiewit Corporation is

5  kind of like the umbrella company and there's several

6  subsidiary companies.  Kiewit Energy is one of several

7  districts in the organization.  Twenty -- I think

8  there's a total of 26 districts.  It's 20,000 employees.

9  It's all over the country and the world for that matter.

10 But the large stable of HR functionality was developing

11 out of Kiewit Energy as a shared service center that

12 would support with these Centers of Excellence so people

13 could get support in all the other areas.

14           THE COURT:  Did they report or consult or

15 have any relationship with the folks in Omaha at Kiewit

16 Corporation?

17           MR. HEDICAN:  Kiewit Energy, for example, if

18 they wanted to get legal support -- payroll would come

19 out of Omaha.  Benefits would come out of Omaha.  They

20 would come out of there.  If they wanted to get legal

21 support, there's an in-house legal team they would

22 consult with.

23           THE COURT:  So they're not completely

24 autonomous, self-sufficient corporations; they share

25 administrative services and things like that?

1        MR. HEDICAN:  Some of it.  And then the HR

2   services in Kiewit Energy, that's where they've cited

3   their -- their HR shared services.  But our view is that

4   the people, the response of individuals I believe we've

5   -- we've provided, but I will confirm that.

6        May I speak to the stock issue, judge?  Would

7   this be appropriate?

8        THE COURT:  Sure.  But, again, this is the

9   same issue that troubles me on the other, that you read

10  a document production request and you decide not to

11  check or you decide not to produce the documents that

12  you receive without any authority from the court or the

13  Federal Rules of Civil Procedure or Rule 34, just take

14  it on yourself to decide how much you're going to heed

15  of plaintiff's response -- request, rather.

16        MR. HEDICAN:  Judge, I thought that our

17  response was -- was responsive and fairly proportionate

18  to what's been requested.  I mean, bottom line is

19  typically the information that you seek on comparators

20  comes from the individual who made the decision, it

21  comes from the same decisional unit, and so we provided

22  that information.

23        Information about somebody in human resources who

24  lost a position in some -- you know, in any one of the

25  other companies isn't going to bear on issues concerning

1    the decision Jason Hefley made or, as the plaintiff has

2    alleged, Mr. Flickinger or Mr. Jennings.  And that's

3    commonplace within employment cases to those -- that's

4    where the -- the view of what is an appropriate

5    comparator is.

6                THE COURT:  Well, going by the allegations

7    of the complaint, you know, this is not the typical "me

8    too" type situation.  Because if the individual

9    defendants and the separate corporations were joint

10   employers or integrated employers so that they shared

11   decision-making with regard to Mr. Russell, then it

12   seems to me that you have a duty to provide information

13   unless the court says you don't when it's properly

14   requested.  And it looks like, as to No. 4, you got the

15   request and you just decided to partly comply.

16               MR. HEDICAN:  Yeah, I understand what you're

17   saying, judge.  I mean, I respectfully disagree because

18   I believe the people that we've provided the response

19   to, I think those are the responsive individuals.

20        I do stand by my view that people that were

21   terminated by -- in HR and other corporations who didn't

22   work with Randy Russell, didn't work with Mr. Jennings,

23   Mr. Hefley, et cetera, I don't -- I don't see how that

24   information would be relevant or proportional to the

25   case, and that was certainly the position that we took

1   with Judge O'Hara.

2             THE COURT:  But your actual response is the

3   same boilerplate:  Overly broad, unduly burdensome,

4   disproportional.  Again not very helpful.

5             MR. HEDICAN:  Well, I -- I guess I can't

6   respond to that, judge, beyond what I've already said on

7   that point.

8             THE COURT:  Okay.  You wanted to say

9   something about a stock plan.

10            MR. HEDICAN:  Yeah.  On the stock plan,

11   Mr. Hefley -- excuse me, Mr. Russell supported Kiewit

12   Power.  Kiewit Power was selecting its nominees for the

13   2016 stock plan.  Mr. Russell was not involved with

14   supporting anyone else on that.

15        Mr. Jennings, whom he alleged was making

16   decisions inappropriately based on age criteria, was

17   making the selection for Kiewit Power.  He doesn't make

18   it for the other entities.  The other entities -- the

19   other districts make their own decisions on who they

20   nominate.

21        And then there's a number of -- and we produced a

22   number of documents in this case as concerned with the

23   2016 stock nomination.

24        I mean, this is a single-plaintiff case in which

25   Mr. Russell is claiming that he engaged in protected

```
 1   activity and that was causally related to his
 2   termination.  He doesn't have to be right on his
 3   underlying belief as long as it was in good faith.
 4        Having to go to all of these different districts
 5   and provide that information for stock nomination and
 6   selections for people he didn't work with and he was not
 7   involved with and the individual whom he allegedly
 8   opposed was not involved with, it's not relevant or
 9   proportional.  And so that's why we did provide the
10   information for Kiewit Power on that stock nomination.
11   I think that was -- one of the two requests was limited
12   to Kiewit Power.  Then I think the other one asked for
13   it across the board.
14        THE COURT:  Twenty-three is all documents
15   created or exchanged in 2016 about the stock plan.  And
16   so, Mr. Reavey, don't you think that's a little
17   overbroad?
18        MR. REAVEY:  Well, judge, I think (23), in
19   fact, is -- I believe is referring to the stock plan
20   reference in paragraph 49 of the defendants' answer.  So
21   I do believe that one is limited to the stock plan that
22   Mr. Hefley had involvement in.
23        THE COURT:  Paragraph 49 just says -- oh,
24   defendants' answer.  I'm looking at the complaint.  I
25   don't have the answer in front of me.
```

1            MR. HEDICAN:  I apologize, I don't either.

2            MR. REAVEY:  Twenty-four as well

3     references -- so paragraph -- the answer, paragraph 49,

4     indicates defendants admitted that Hefley provided a

5     financial modeling program for employees to evaluate

6     whether participation in the stock plan was preferable

7     to declining to participate.  So -- and (24) also

8     references the -- the stock plan from paragraph 49.

9        So I think both of those are limited to the stock

10    plan Mr. Russell had a role in.  I'm trying to -- I do

11    think we had an overarching request that responsive

12    documents to all the stock plans would have to be looked

13    for and responded to, but having trouble putting my

14    finger on that one.

15           THE COURT:  So how did defendant decide to

16    produce the -- all of the relevant documents for the

17    persons who were invited to become new stockholders

18    under the stock plan?

19           MR. HEDICAN:  So Mr. Jennings had a

20    subfolder with all the communications and documents

21    regarding the 2016 Kiewit Power.  We produced that.  As

22    we went through the e-mails -- we did e-mail searches.

23    If we saw any e-mail communication regarding the stock

24    plan and the nominations, we produced that.

25        We did produce the documents that were just

1   referenced in (49) where it was a modeling program that

2   was provided to different individuals.  Because if you

3   go into the stock plan, you have to buy the stock and

4   there's a return and there's value in that.  That's

5   essentially a retirement vehicle, but then you lose your

6   match, and it's a pretty good match in their 401k.

7          So there's a model that's provided to let people

8   evaluate whether they're better off going into buying

9   the stock or staying out of it and getting that match,

10  and that -- we did provide those.  Judge, I really -- my

11  response would be I don't believe there's anything more

12  to provide on the 2016 Kiewit Power stock nomination.

13          THE COURT:  So, Mr. Reavey, I don't

14  understand what you're looking for on this.

15          MR. REAVEY:  Yes, judge, I would -- I

16  think -- just from looking sort of on the fly here, I

17  think, as to the stock plan, the requests that -- that

18  are at issue in this proceeding are (23) and (24).  And

19  to me those appear to be limited to the stock plan that

20  Mr. Russell had direct involvement in which is the stock

21  plan for Kiewit Energy; correct?

22          MR. RUSSELL:  It was Kiewit Power.

23          MR. REAVEY:  Or Kiewit Power, I apologize.

24  So if I'm correct with that, we'll concede that -- that

25  point that -- bear with me if I could just have a moment

1   with my client.

2       That's what I -- I wanted to confirm.  I thought

3   we had an overarching request that when all of the stock

4   plans from the standpoint of -- and it ties back into

5   this overarching HR.  If it's true that the HR was

6   involved in all of these other plans and, you know,

7   believed it was okay to do this modeling that would

8   exclude older people, we feel those documents would be

9   relevant.

10      But if that request -- that specific request is

11  not part of our objection, then I think, you know,

12  there's not a whole lot you can do about it.

13      But if you don't mind, if we can just -- I'll

14  check yet this afternoon and confirm that, but the

15  confirmation would be, yes, judge, it's -- it's correct

16  that the request as to the stock plan only relate to the

17  -- the one that Mr. Russell was directly involved in.

18          THE COURT:  I'm sorry, I'm not following

19  this.  You're -- so paragraph 23 is seeking documents

20  about the stock plan referred to in paragraph 49 and

21  you're saying that is Kiewit Power?

22          MR. REAVEY:  Yes.  Yes.

23          THE COURT:  Okay.  And so same thing with

24  paragraph 24 ties back to defendants' answer 49.  So

25  what -- I don't -- what are you needing to check?

18-2144  Russell v Kiewit, et al  7.15.19                    63

1          MR. REAVEY:  Yeah, I thought we had -- as to

2    excluding the other defendants, there's an interrogatory

3    that defendants did that with as well and I'm -- I'm

4    just not sure if that relate to the stock plan at all.

5    So...

6          THE COURT:  Okay.  So with regard to (23)

7    and (24), what issue do you need the court to decide?

8          MR. REAVEY:  Yeah, I guess, judge, the issue

9    would be that Kiewit Corporation, the parent company,

10   they are the ones that promulgated the plan that

11   Mr. Russell was working with.  So from that standpoint

12   we believe any -- any documents, for example, out of

13   Kiewit Corporation related to the stock plan that

14   Mr. Russell worked on, those should be produced and

15   those would be responsive.

16         THE COURT:  Okay.  Why wouldn't they be?

17         MR. HEDICAN:  Judge, so as I indicated, we

18   believe we produced the responsive documents concerning

19   the nomination for Kiewit -- out of Kiewit Power for

20   2016.  Our concern was that the request for any

21   documents concerning the stock plan, if that means that

22   we need to go get nominations for the other departments,

23   the other districts and the people that they're

24   selecting, that that's -- that's a very large task.

25   That's -- those districts Mr. Russell didn't serve.  He

1   wasn't involved in that.  Mr. Jennings wasn't involved

2   in that.

3          It's a retaliation case.  So he's allegedly

4   opposing what Mr. Jennings is doing, not what others are

5   doing.  And the underlying issue is just the causal

6   relationship to that, not ultimately what's going on

7   with the plan, particularly in selections and other

8   locations.

9          THE COURT:  Okay.  What about

10  Interrogatory 8, instances of complaints, investigations

11  or audits against any defendant about the type of

12  discrimination that plaintiff opposed here?

13          MR. HEDICAN:  We provided that information

14  for Kiewit Power, the entity that he supported, judge.

15  We also did inquire as to the individual named

16  defendants and those alleged decision-makers as to

17  whether they had any complaints against them or claims.

18  We have provided the information that we have concerning

19  Mr. Hefley.  There wasn't for Mr. Flickinger or

20  Mr. Jennings.

21          The other -- again, because the decisions are

22  made out of that particular individual, the complaints

23  against -- particularly private complaints that would

24  have been raised against other entities in which these

25  people were not involved intrudes upon the privacy

1   issues and concerns that we have when we have a

2   confidential reporting system in which employees can

3   bring their issues and concerns and bring those to bear

4   understanding those things will be treated

5   confidentially.

6          In this particular case, we provided the

7   information on the public filings for the units that he

8   supported.  We also provided anything that was internal

9   as concerns the decision-makers.

10          And to go beyond that for people that Mr. Russell

11   didn't work with and aren't connected, again to this

12   issue of opposition, in a retaliation case we think is

13   overly broad and impinging upon those privacy concerns

14   that we have with our employees and that commitment that

15   we made.

16          THE COURT:  You're saying named defendants,

17   if they had complaints or investigations or audits, you

18   didn't produce information?

19          MR. HEDICAN:  No, no, we did.

20          THE COURT:  Oh, you did.

21          MR. HEDICAN:  Right.  And there was only for

22   Mr. -- there was for Mr. Hefley.

23          THE COURT:  Okay.  And so what's the issue

24   here, in terms of the objection to Judge O'Hara's order?

25          MR. REAVEY:  Judge, I think as to the stock

1   plan -- and this issue it may be as simple as ordering

2   that defendants withdraw their objection that, you know,

3   these are non-employers so we don't have to produce.

4   And that's what sort of overlaid these issues is

5   defendants' position that, well, your client didn't work

6   for these entities, so we don't have to respond to

7   discovery.  I think if they -- if they were to withdraw

8   that objection and just respond, that would take care of

9   the issue.

10          I guess we're concerned about sort of that being

11  left in there and not knowing -- you know, Mr. Hedican

12  has made a lot of statements about, well, these same

13  guys would also, you know, be the same guys for this

14  other defendant.  And to be honest, I can't keep track

15  of all that.

16          And I just think it's a matter of -- you know,

17  because they didn't file a motion to dismiss and, you

18  know, those -- those other entities are defendants, it's

19  alleged they're joint employers so they need to respond

20  accordingly with respect to those entities, which would

21  just be simply withdraw the objection based on that

22  entity being a non-employer.

23          And I would just note, I mean, there are -- there

24  are mechanisms that, you know, defendants could have had

25  that issue taken up early on by the court.  And but

1   given that that didn't happen, they're defendants and

2   they have to respond to the discovery.

3           THE COURT:  All right.  Let's go back to the

4   beginning.  So, first of all, the court finds that all

5   of defendants' boilerplate objections about undue burden

6   just like of proportionality and overbreadth are -- need

7   to be stricken and disregarded.

8           Rule 34(a) -- no, 34(b)(2)(B) of the Federal

9   Rules of Civil Procedure makes it very clear that if

10  you're objecting you have to state with specificity the

11  grounds for objecting to the request including the

12  reasons.  So that's a very fact specific inquiry in the

13  context of each particular objection.  I don't believe

14  that defendant has properly raised or preserved any

15  objections with regard to those three issues.

16          It seems to me that with regard to Requests 8

17  and 9, we could go a couple of different directions.

18  But the first place we need to start is by having

19  defendant make an amended response to paragraphs 8 and

20  9, not including objections, because I think that's

21  water under the damn at this part.  And the response has

22  to state with specificity what documents have been

23  produced and what documents have been withheld.  Also

24  for each document which has been withheld, defendant

25  needs to provide a reason.

1        I hesitate to say that we need to go through

2    8,000 documents and make a log for each one, and I'm

3    going to direct that attorneys meet and confer about

4    what's the best way to figure out and get to the bottom

5    of this.

6        Clearly if there are false negatives or documents

7    with the plaintiff's name that have nothing to do with

8    this lawsuit, I'm sure that counsel can figure out a way

9    to sort the wheat from the chaff.  And I would like a

10   report back from you.  We'll talk about what's a

11   reasonable date for that.

12       On the .pst files, I think that this is somewhat

13   duplicative of the document requests in paragraphs 8

14   and 9, but, again, defendant needs to provide an amended

15   response stating what exact documents it has provided.

16   And with regard to ones that were not provided, a very

17   specific statement of the reasons for not providing

18   them.  Then I would like counsel to again meet and

19   confer to see if you can find a path forward in this

20   regard.

21       If plaintiff is basically seeking his own e-mails

22   and they're already produced in response to (8) and (9),

23   this issue becomes moot.

24       But let's go back to (8) and (9) for a second.

25   In making your amended response, I want you to

1    specifically address text, other electronic

2    communications from cell phones, computers, hard drives

3    and other electronic devices so that we have the entire

4    universe of possible electronic communications and we

5    have your client pinned down as to exactly what has been

6    and has not been produced and why.

7         On Document Production Request 4, 23 and 24, I

8    think, as counsel suggested, these issues may be

9    resolved by just having defendant file amended responses

10   and clarify, again, what the production has been, what

11   has not been produced, and having the responses reflect

12   what's actually occurred.  Again, I would like you all

13   to consult about that and see if -- if this issue is

14   moot at this point.

15        So implicit in this ruling is a finding that

16   because defendants didn't properly object to the

17   overbreadth, proportionality, and burdensomeness of the

18   discovery request, Judge O'Hara abused his discretion in

19   finding that the requests were overly broad and not

20   proportional and unduly burdensome.

21        How long and -- how long do you all need to

22   confer and what would be the best format for sorting

23   through these issues in the light of my rulings?

24             MR. HEDICAN:  Judge, if I may just -- I have

25   a week jury trial that starts next week with

 1   Judge Battaillon, so I'm kind of short on time --

 2              THE COURT:  He takes priority.

 3              MR. HEDICAN:  -- in the short run.  Well, I

 4   -- you would come first in my mind, but right now my

 5   client needs me to put attention on that, so...

 6              THE COURT:  I understand.  Tell

 7   Judge Battaillon hello from me.

 8              MR. HEDICAN:  I will do so.  But, in any

 9   event, if I might ask you some questions, because what's

10   most beneficial to me is to be able to go back to my

11   client with a very clear understanding of your

12   expectations.

13         So I understand the objections are gone.  We need

14   to provide a response explaining things.  Am I to

15   understand your order as saying, hey, you need to go

16   back and image these phones and laptops that you have

17   not imaged and you need to search them?

18              THE COURT:  So that may be the proper

19   application of what I'm saying.  What I'm saying is you

20   need to comply with the discovery request and not

21   reinterpret your obligations out of existence or

22   mitigate what your client's required to do based on what

23   you think is reasonable given the overall discovery and

24   issues in the case and so forth.

25              MR. HEDICAN:  Sure.

18-2144  Russell v Kiewit, et al  7.15.19

1            THE COURT:  I don't want to say something
2    that I haven't had a chance to actually put pen to paper
3    about, but I think, for example, on (8) and (9) that
4    probably is where we end up, don't you?
5            MR. REAVEY:  Yes, Your Honor.  And I might
6    -- if I could just add on the scheduling.  We're
7    completely flexible.  The only thing we have -- I think
8    the discovery deadline now is September 1.  Obviously we
9    would like to have this production before having to take
10   depositions of defense witnesses.  So if we can get some
11   relief on that end, we're fine with accommodating
12   Mr. Hedican's trial.  And he being out of town, you
13   know, if we feel like we need to get together in person,
14   you know, maybe we can meet halfway or so.  As long as
15   we get relief on the discovery deadline, we're
16   completely flexible.
17           THE COURT:  Well, the trial is not until
18   halfway through 2020, right, like a year from now?
19           MR. REAVEY:  Yeah, I think so, that's
20   correct.
21           MR. HEDICAN:  It's June.  The discovery
22   cutoff I think is September 1 or 6.  It's like that
23   first week.  So just thinking out loud here again
24   because I just want to make sure that we meet your
25   expectations.

1          THE COURT:  So I'll have to go sit down with

2    Judge O'Hara probably in about 10 minutes.

3          MR. HEDICAN:  Is that an uncomfortable

4    conversation?  Just curious.

5          THE COURT:  No.  I've never done it before

6    with Judge O'Hara, so there -- but I think he'll be a

7    good sport.  But I'll talk to him about your discovery

8    issues and I'm sure he'll be very understanding.

9          MR. HEDICAN:  It would -- I mean, it would

10   seem to me, just knowing what we went through to review

11   it and having worked in a small firm myself, it's going

12   to -- there's an issue of us getting it to them and

13   there's an issue of you guys digesting it.

14         THE COURT:  It really does seem to me that,

15   while I understand your argument that it's not okay to

16   just have the search terms in a discovery request and

17   get everything that might meet the search terms, that

18   might be the most efficient, cost effective way of doing

19   this if you all can reach some understanding about a way

20   to clawback protected documents or redact documents that

21   might have references to individual personnel matters or

22   something.

23         MR. REAVEY:  Thank you.

24         THE COURT:  Do you think 30 days is enough?

25         MR. HEDICAN:  Yeah, I think so.  And I don't

1  know if you're -- it's probably Judge O'Hara's issue.  I

2  mean, I'm just, again, thinking out loud.  If I talk to

3  a client about -- saying let's just give other -- if we

4  just give over the .psts and that largely takes care of

5  (8) and (9), it seems to me then I would just want

6  disclosures.

7          If they find things that they intend to use,

8  because that's one of the other problems when you --

9  when you produce 14,000 e-mails, we have a right, I

10  believe, before deposition to have disclosures and what

11  fact will be used with witnesses, because otherwise then

12  I really do have to review all 14,000, if that makes

13  sense.

14          THE COURT:  I'm really hoping that the two

15  of you can work better going forward.  I gathered just

16  from the mountain of paper here that maybe it hasn't

17  been the smoothest road between counsel, but everybody

18  can always do a little better.

19          MR. REAVEY:  I appreciate that, judge.  But

20  as I told Mr. Hedican several times, he's been fine.  I

21  don't think this rests with Mr. Hedican.

22          As he mentioned in part of his presentation, he's

23  done the searching with what has been provided to him by

24  Kiewit and Kiewit's in-house counsel.  So I don't think

25  this really sits with Mr. Hedican, and I've told him

18-2144  Russell v Kiewit, et al  7.15.19                    74

```
 1    that repeatedly.  I think he's on a very tight leash
 2    with the client on what they will give him, what they'll
 3    let him give to me, and I think that's where the problem
 4    is.  So...
 5              MR. HEDICAN:  I appreciate that but I -- you
 6    know, we're -- I don't feel that's the case with the
 7    client.  But thank you nonetheless.
 8              THE COURT:  Okay.
 9              MR. HEDICAN:  I just can't -- I can't let
10    this leave and have you believe that that's the case
11    with the clients.
12              THE COURT:  Okay.  Well, I'm not accusing
13    anybody of acting in bad faith or, you know, threatening
14    sanctions or anything, but I do think we can do better.
15    So I'll go talk to Judge O'Hara right now and prime the
16    pump for extending your discovery deadline.
17              MR. REAVEY:  Thank you, judge.
18              MR. HEDICAN:  Thank you, judge.
19              THE COURT:  Thank you all.  I know this is
20    pretty short notice but I think this time has been well
21    spent.
22              (Proceedings adjourned.)
23
24
25
```

```
1                           CERTIFICATE

2         I certify that the foregoing is a true and

3    correct transcript from the stenographically reported

4    proceedings in the above-entitled matter.

5         DATE:  July 26, 2019

6
                    /s/Kimberly R. Greiner
7                   KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                    United States Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```