**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**LLOYD MARTLEY,**

     **Plaintiff,**

     **v.**　　　　　　　　　　　　　　　　**Case No. 2:19-cv-02138-HLT**

**BASEHOR, KANSAS, CITY OF, et al.,**

     **Defendants.**

---

## MEMORANDUM AND ORDER

This is a contentious employment dispute. Plaintiff Lloyd Martley alleges that Defendant City of Basehor violated the Equal Pay Act ("EPA") by paying his successor, Leslee Rivarola, more than it paid him to serve as the City Administrator. Martley also asserts EPA and First Amendment retaliation claims against the City and its mayor, David Breuer, because City officials contacted law enforcement to report issues with Martley's retirement contributions after learning that Martley filed this lawsuit.

Defendants move for summary judgment on all claims. Based on the undisputed facts, no reasonable jury could find that Martley and Rivarola performed substantially equal work as City Administrator because Martley worked part-time in the role and Rivarola worked full-time. Additionally, Martley has not identified an adverse action sufficient to sustain his retaliation claims. Defendants are thus entitled to summary judgment on all claims.

## I.　　BACKGROUND

Normally, the Court endeavors to set forth a comprehensive statement of the undisputed facts. Martley greatly complicated this task. He responds to Defendants' 48 statements of fact by disputing all but 16. His response to the disputed facts often includes legal argument and additional facts, with one egregious example containing 21 subparts. He then adds an additional 527 facts,

which he generally cites in sweeping ranges throughout his analysis (e.g., one citation spans over 300 facts).[1, 2]

Although the Court recognizes the need for a comprehensive record, the Court does not recall a summary-judgment motion with this many facts or with such unhelpful citations. *See Coolidge v. Consol. City of Indianapolis*, 2006 WL 1072995, at *1 (S.D. Ind. 2006) ("Effective lawyering includes identifying those facts that are truly material to one's case and resisting the temptation to throw everything at the court to see what sticks. . . . [N]either does the court have the time or resources to weed through protracted statements of facts in search of those 'needles in the haystack' that are actually relevant to the issues at hand."). Nevertheless, the Court has reviewed the facts and summarizes the relevant undisputed facts below and discusses additional facts that warrant mention in the analysis.

The City of Basehor is a municipal corporation in Kansas. Defendants' Statement of Uncontroverted Fact ("DSOF") 1.[3] Breuer served as mayor of the City from approximately 2012

---

[1]  Martley's approach to the facts arguably fails to comply with the letter of the local rule on summary judgment, and certainly the spirit. *See* D. Kan. Rule 56.1 (providing for a "concise statement of material facts"); *see also Tolle v. Am. Drug Stores, Inc.*, 2006 WL 1537398, at *1 (D. Kan. 2006) ("Defendants' initial brief is 31 pages with 16 pages of facts. Plaintiff's response brief, however, is 143 pages with some 124 pages dedicated to factual assertions. Plaintiff's brief is a flagrant violation of D. Kan. Rule 56.1(b) . . . .").

[2]  Martley has also sought leave to file a surreply. Doc. 307. Surreplies are not permitted without leave of court. *See Patterson v. Lansing*, 2001 WL 946181, at *2 (D. Kan. 2001). Martley makes almost no attempt to explain why a surreply is needed. The only explanation provided is that "Defendants have used their Reply . . . to raise new arguments and, in doing so, they continue to cite to exhibits that have not been properly submitted for consideration on a motion for summary judgment." Doc. 307 at 1. As to the latter point, the Court questions why a surreply is needed to address exhibits that were apparently relied on in Defendants' motion and continued to be cited in the reply. Martley could—and did, *see, e.g.*, Doc. 299 at 5—challenge the propriety of the exhibits in his response. As to the former point, the "new arguments" in the reply are just Defendants' responses to arguments made by Martley in his brief. *See* Doc. 299 at 101-02, 105; *see also* Doc. 307-1 at 2-4. Like here, a reply that addresses arguments raised in a response brief does not make new arguments that justifies additional briefing. *See Assessment Techs. Inst., LLC v. Parkes*, 2021 WL 4860553, at *4 (D. Kan. 2021). Accordingly, Martley's motion for leave to file a surreply is denied. The Court notes, however, that it has reviewed the proposed surreply. Even if it were to consider it, the surreply would not change the outcome of this order.

[3]  Citation to any statement of fact considers any response or reply and also the underlying exhibit where necessary.

through 2021. DSOF 2-3. Martley started working for the City as a police officer in 1994 and was appointed Police Chief in 2008. DSOF 4-5.

In 2009, the City Administrator resigned, and Martley was appointed to serve as Interim City Administrator. DSOF 6. His appointment was pursuant to Resolution No. 2009-08. Doc. 290-1. The City appointed Martley "[t]o serve in the role of City Administrator until a permanent Administrator is hired." *Id.* Resolution 2009-08 states:

> The City and Chief Martley agree that Chief Martley's first responsibility is to continue to be in charge of, and provide leadership to, the Basehor Police Department, and that his undertaking of City Administrator duties on a temporary basis will not adversely affect the Governing Body's view of his performance as Police Chief. In this regard, the Governing Body understands and acknowledges that Chief Martley is not trained as a City Administrator and likely is unfamiliar with many of the duties performed by an Administrator. However, the Governing Body recognizes Chief Martley's leadership skills and believes such skills will be beneficial to his performance of temporary City Administrator duties. When the Governing Body hires a new City Administrator, Chief Martley will be transitioned out of the City Administrator role and will return to performing full time Police Chief duties.

*Id.* Martley was paid between $37,000 and $39,000 for his work as City Administrator. DSOF 18.

The City subsequently hired Mark Loughry as a full-time City Administrator in August 2009. DSOF 10. His base salary as the full-time City Administrator was $88,000. DSOF 11. He was also given a $250 monthly car allowance. *Id.* Loughry's salary as full-time City Administrator was therefore higher than the salary Martley received as the interim City Administrator. DSOF 12. The City terminated Loughry in September 2011. DSOF 13; Doc. 284 at 2.

After Loughry's termination, the City again appointed Martley to serve as interim City Administrator pursuant to Resolution No. 2014-02. DOSF 14; Doc. 284 at 2; *see also* Doc. 290-2. Resolution 2014-02 states:

> That the Governing Body and Chief Martley agree that Chief Martley's first responsibility is to continue to be in charge of, and provide leadership to, the Basehor Police Department, and that his performance of City Administrator duties will not adversely affect the Governing Body's view of his performance as Police Chief. The Governing Body has determined that Chief Martley shall be the City Administrator, until it is determined that a separate, full time City Administrator should be hired. The City Administrator position and the Police Chief position are exclusive of each other, and a decision to make a change in one position will not impact the other.

Doc. 290-2.[4] Martley's pay was to "continue at the rate previously established for him as the interim City Administrator." *Id.*; DSOF 16.

In April 2018, Breuer stated that the city should "begin searching for a new full time city administrator to replace Chief Martley." DSOF 20; Doc. 290-6 at 2. Martley retired from his roles as City Administrator and Police Chief on August 1, 2018. DSOF 19, 21; Doc. 284 at 2-3.

City officials subsequently began putting together a job posting for a full-time City Administrator. DSOF 22. Breuer looked at information to see what city administrators and managers were typically paid, and he consulted with other similar municipalities to see what they were paying. DSOF 23. The City Administrator job posting listed the following qualifications:

> At least five years of progressively responsible experience in municipal government, including three years of administrative and leadership responsibility. Strong managerial experience, economic development experience and the ability to work closely with the City Council is essential. An exceptional ability to develop effective partnerships is required. A Bachelor's degree from an accredited college or university or any equivalent combination of education and experience.

---

[4]   DSOF 15 represents that Resolution 2014-02 states something slightly different. It appears that DSOF 15 states the wording of Resolution 2009-08, which is different but functionally similar to Resolution 2014-02. The Court cites the language of Resolution 2014-02 as it appears in the exhibit, Doc. 290-2.

Doc. 290-8. The stated compensation was "$100,000 or commensurate with experience/qualifications." *Id.*; *see also* DSOF 24-25.[5] Martley did not apply for the full-time City Administrator position. DSOF 29.

The City subsequently hired Rivarola as City Administrator at an annual salary of $117,000. DSOF 31. On February 6, 2019, shortly after the City hired Rivarola, Martley's attorney sent a letter to Breuer indicating that Martley planned to pursue an EPA claim due to the disparity in compensation he received as City Administrator compared to Rivarola. DSOF 32.

Rivarola's resume states she has two years' experience as a Public Works Director, three years' experience as an Assistant City Administrator, three years' experience as a City Administrator, and four years' experience as a Public Administration Consultant. DSOF 35.[6] Her resume also states she has a Bachelor of Science in Criminal Justice Administration and a master's in public administration. Doc. 290-20 at 4. Martley does not have a four-year college degree and prior to being appointed interim City Administrator, he did not have any training in city administration. DSOF 33-34.[7]

---

[5]   Martley disputes these facts on the grounds that Defendants have not provided any evidence that Exhibit 8 (Doc. 290-8) is the job posing used to hire Martley's replacement. Doc. 299 at 5. However, Defendants also cite to Exhibit 23 (Doc. 290-23), which is an affidavit of Katherine Renn, Basehor's City Clerk. She states that Exhibit 8 is a true and accurate copy of the City Administrator job posting. Doc. 290-23 at 1. Martley disputes the sufficiency of Renn's affidavit and argues that "[s]uch miniscule information about the documents is not sufficient to authenticate them for purposes of summary judgment." Doc. 307-1 at 5. The Court disagrees. Regardless of whether Renn's affidavit would be sufficient to authenticate the documents for trial, the Court is not convinced that the content or substance of this information would not be admissible in some other form at trial. *See Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010). Martley does not otherwise dispute the substantive information about what the City Administrator job posting included.

[6]   Martley disputes this fact because "[n]o evidence has been supplied by Defendants to show Rivarola had the experience included in the cited Resume" and "[n]o affidavit has been supplied by Rivarola to indicate the cited Resume is what she submitted to the City, nor whether it accurately describes her prior city administrator experience." Doc. 299 at 9. But, again, Defendants have submitted an affidavit of the City Clerk stating that the exhibit is a true and accurate copy of Rivarola's resume. Doc. 290-23. To the extent the resume itself would not be admissible, its contents or substance would likely be admissible in some other form at trial. *See Johnson*, 594 F.3d at 1210. Further, whether Rivarola actually has the experience stated on her resume seems irrelevant to the extent the City believed she did and paid her accordingly.

[7]   Martley disputes this fact with the argument that no one complained he lacked experience or training to serve as City Administrator and that he performed the role well. Doc. 299 at 6-7. But he does not actually dispute the

For some or all of the time that Martley served as both City Administrator and Police Chief, his total compensation (both his pay for being City Administrator and the pay he received for being Police Chief) was reported to the Kansas Police & Fireman ("KPF") retirement fund. *See* DSOF 37.[8] But contributions to the KPF retirement fund should be only based on compensation earned for work considered KPF duty, meaning working as a policeman or fireman. DSOF 38-39. At some point, the City became aware that Martley's total compensation had been reported to KPF. DSOF 40. The circumstances of how and when this was discovered is disputed. The City subsequently referred the issue to KPERS, the state retirement system. DSOF 43. KPERS later sent Martley a letter stating that "it came to KPERS' attention that the compensation you received for your City Administrator position, a position not covered by the Retirement System, was erroneously reported to KPERS and included in your KP&F salary, which means it was incorrectly used in your final average salary for retirement benefit calculation purposes." Doc. 290-14; *see also* DSOF 45.

Rivarola and the city attorney also requested that the Leavenworth County Sheriff's Department investigate Martley's retirement contributions. DSOF 46. But no criminal charges have been filed against Martley. DSOF 48. The timing of the contact with KPERS and the sheriff's

---

substance of the statement of fact, which is based on his own deposition testimony. *See* DSOF 33. Martley also seems to dispute that Rivarola was qualified to be City Administrator because she was not a resident of Basehor, and no exception was granted to her outside residency by the city council. But the exhibit he cites—Rivarola's employment contract as adopted through resolution by the city council—specifically states that "[t]he Administrator shall not be required to be a resident of the City for so long as she serves as Administrator." *See* Doc. 299-44 at 4.

[8]   Martley testified at his first deposition that his total compensation was reported to KPF. *See* Doc. 290-4 at 8-9. Martley contends this questioning was "a trap laid by Defendants to extract an admission from Martley (i.e., that he was the person who reported his income, even though Defendants knew that was false) that they later would use against him" and that additional testimony shows that people other than Martley actually did the reporting. Doc. 299 at 10-11. Who actually did the reporting is not relevant to this motion. But it does not seem to be disputed that Martley's total compensation was reported to KPF. *See id.* at 15 ("During the audit years of 2009 through 2018, segregated compensation earmarked for Martley's city administrator work was reported to KPF."). Martley has long contended that he was instructed by KPF to report his total compensation. *See id.* at 13.

department is somewhat disputed, but it is undisputed that it happened after the City had been notified that Martley was bringing an EPA claim. Defendants' motivation in referring the matter to KPERS and the sheriff's department is also disputed.

## II.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a 'reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). To carry this burden, the nonmovant "may not rely merely on . . . its own pleadings." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (internal quotations and citations omitted). "Rather, it must come forward with facts supported by competent evidence." *Id.*

## III.    ANALYSIS

Martley asserts three claims against Defendants: (1) violation of the EPA based on the different salaries the City paid him and Rivarola as City Administrator; (2) retaliation in violation of the EPA for reporting his retirement contributions to officials; and (3) retaliation for exercise of his First Amendment rights in violation of 42 U.S.C. § 1983, which is also based on the investigation into his retirement contributions. Doc. 284 at 13-14. The Court first considers

Martley's EPA claim. It then considers his retaliation claims together. Breuer also asserts qualified immunity, which the Court considers in the context of the retaliation claims.

### A. Equal Pay Act Claim

The EPA prohibits wage discrimination on the basis of sex for substantially equal work. *Riser v. QEP Energy*, 776 F.3d 1191, 1195 (10th Cir. 2015). EPA claims are evaluated under a two-step process. *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006). First, the plaintiff must establish a prima facie claim of unequal pay. *Id.* The elements of a prima facie case are:

> (1) the plaintiff was performing work which was substantially equal to that of employees of the opposite sex, taking into consideration the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; [and] (3) employees of the opposite sex were paid more under such circumstances.

*Id.* at 1311 n.5. Second, if a plaintiff meets this showing, the burden of persuasion shifts to the defendant to justify the wage disparity based on one of four reasons: "(1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; (4) a disparity based on any factor other than sex." *Id.* at 1311 (internal quotation and citation omitted); *see also* 29 U.S.C. § 206(d)(1). At this second step, "the employer's burden in an EPA claim is one of ultimate persuasion." *Mickelson*, 450 F.3d at 1311. This requires the defendant to produce "sufficient evidence such that no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which the plaintiff complains." *Id.* at 1312 (internal quotation and citation omitted); *see also Riser*, 776 F.3d at 1198 ("At the summary judgment stage, this means an employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary." (internal quotation and citation omitted)).

### 1.      Prima Facie Claim

Defendants first argue that Martley cannot establish a prima facie claim under the EPA because he cannot demonstrate that he and Rivarola performed substantially equal work because Martley was a part-time City Administrator and Rivarola was a full-time City Administrator. Doc. 290 at 11-14.

Substantially equal work is work that "requires equal skill, effort, and responsibility, and which [is] performed under similar working conditions." *See* 29 U.S.C. § 206(d)(1). This standard is not construed broadly, although jobs need not be identical. *Lewis v. D.R. Horton, Inc.*, 375 F. App'x 818, 823 (10th Cir. 2010). The analysis does not turn on job titles or descriptions, but rather by the actual work performed. *Riser*, 776 F.3d at 1196. Minor differences do not matter, but "jobs that are merely alike or comparable are not 'substantially equal' for purposes of the EPA." *Id.* "[T]here must be evidence that [the plaintiff] performed substantially all of the duties of a higher-paid co-worker, and not simply that a higher-paid co-worker took over some of [the plaintiff's] job duties." *Lewis*, 375 F. App'x at 823. It is the plaintiff's burden to establish that work performed was substantially equal. *See id.*

In evaluating whether Martley has shown that his and Rivarola's work was substantially equal, the Court first considers whether Martley served as City Administrator on a full-time or part-time basis, as this is the primary distinction claimed by Defendants. Martley does not respond by coming forward with facts showing that he performed the City Administrator role on a full-time basis. Instead, he repeatedly objects to characterizations of his role as part-time. This is largely based on the fact that the resolutions appointing him do not use the phrase "part-time," and no one ever referred to him as the part-time City Administrator.

But it is undisputed that Martley held the positions of Police Chief and City Administrator at the same time. The resolutions appointing Martley as City Administrator specifically state that his "first responsibility" is being Police Chief. His appointment was to last "until it is determined that a separate, <u>full time</u> City Administrator should be hired," Doc. 290-2 (Resolution 2014-02, emphasis added), and that when a new City Administrator is hired, Martley "will return to performing <u>full time</u> Police Chief duties," Doc. 290-1 (Resolution 2009-08, emphasis added). It is also <u>undisputed</u> by Martley that the former city administrator (who was male) "received a higher salary as full time City Administrator than [Martley] received <u>as the part time Interim City Administrator</u>." DSOF 12; *see* Doc. 299 at 2 (stating that DSOF 12 is undisputed). Based on this record, no reasonable jury could conclude that Martley was serving as full-time City Administrator.[9]

Because no reasonable jury could conclude that Martley's role as City Administrator was anything but part-time based on the record evidence, the Court must consider whether Martley has shown that he and Rivarola performed substantially equal work given that Rivarola serves as City Administrator on a full-time basis, while Martley served only part-time, with his primary focus being Police Chief.

---

[9]   Martley claims that Defendants are precluded from drawing distinctions based on his part-time status because of an early discovery ruling in this case. Martley sought certain records from third parties who are clients of Rivarola's private consulting business. Doc. 299 at 102-03. The magistrate judge quashed the subpoenas, finding that, although she could not "discern how Rivarola's actions outside of her City Administrator duties are relevant to the issues at hand," the number of "hours Rivarola worked and the compensation she received while performing her City Administrator duties . . . would be relevant, and such information can be sought at Ms. Rivarola's deposition or through a document request from the City." Doc. 61 at 8. The then-assigned district court judge overruled Martley's objection to the magistrate judge's order. Doc. 96 at 4-5. Ultimately, Martley was only denied the chance to subpoena Rivarola's clients directly. Nothing stopped him from seeking information from her at her deposition or from seeking information about how much time Rivarola spent in her City Administrator role. Based on this, Defendants are not precluded from drawing distinctions between Martley's and Rivarola's positions because one was part-time and one was full-time. Nor is this a surprise defense, as it was discussed in the context of the subpoenas to the third parties very early on in the case. *See* Doc. 61 at 4 ("Plaintiff states the City repeatedly refers to him as a 'part time city administrator,' suggesting it was not possible for him to fulfill the duties of City Administrator given his additional duties as City Police Chief.").

10

Other courts have found that working part-time versus working full-time at a job requires a difference in effort. *Emswiler v. Great E. Resort Corp.*, 602 F. Supp. 2d 737, 753 (W.D. Va. 2009) ("First, the combined team of Koebig, Loeblich, and Rice worked substantially more hours than did the plaintiff. A higher level of compensation for Emswiler's three male successors would be expected, given the greater level of effort expended."); *see also* 29 U.S.C. § 206(d)(1) (stating that substantially equal work is work that "requires equal skill, effort, and responsibility, and which [is] performed under similar working conditions."). And courts have agreed that drawing comparisons between part-time and full-time employees is not appropriate. *See Asher v. Riser Foods, Inc.*, 1993 WL 94305, at *4 (6th Cir. 1993) ("Having failed to offer any proof that her continued classification as a part-time employee was related to her gender, plaintiff cannot, for purposes of her Equal Pay Act claim, compare herself to full-time employees."); *LaRocco v. Nalco Chem. Co.*, 1999 WL 199251, at *13 (N.D. Ill. 1999) ("The court concludes that LaRocco cannot establish a prima facie case of wage or working conditions discrimination . . . [because] she was employed part-time. There is an inherent difficulty in comparing LaRocco, who was working part-time, with full-time Porta Feed marketers . . . ."); *E.E.O.C. v. Altmeyer's Home Stores, Inc.*, 672 F. Supp. 201, 214 (W.D. Pa. 1987) ("There can be no comparison between one who worked full time and one who worked part time. Whether they were male or female makes no difference. The basis for the comparison is lacking."). *But see Lovell v. BBNT Sols., LLC*, 295 F. Supp. 2d 611, 619 (E.D. Va. 2003) ("Neither the statute nor controlling circuit authority squarely addresses whether full-time employees are, on that basis alone, unsuitable comparators for part-time employee plaintiffs.").[10]

---

[10] *Lovell* goes on to state: "Although the statutory language does not conclusively answer this question, Congress's use of the word 'rate' points persuasively to the conclusion that a valid comparison is not necessarily foreclosed merely on the basis of a difference in the number of hours worked per week." *Lovell*, 295 F. Supp. 2d at 619. Otherwise, "a female employee who works thirty-eight hours per week cannot compare herself to a male employee

Martley argues that the part-time nature of his work does not make it dissimilar to that of Rivarola because he performed all the same duties and had the same responsibilities as Rivarola (i.e., the effort is the same). In support of this contention, he provides a single citation spanning about 75 of his additional facts. *See* Doc. 299 at 105. This is more or less the extent of Martley's analysis of this issue—an issue for which he bears the burden of proof.

The Court has reviewed the 75 facts cited by Martley *en masse*. They generally assert that the duties and responsibilities of the City Administrator as laid out in the Basehor City Code did not change from Martley's tenure to Rivarola's. However, city officials testified that the scope of the work and expectations for the position of City Administrator were different between Martley and Rivarola given that Rivarola was being hired as a full-time City Administrator while Martley was performing two roles at the same time, with his primary focus on being Police Chief. There were certain tasks that Martley was not expected to fulfill, such as attending certain meetings, while Rivarola was expected to do those tasks. Doc. 306 at 5-6 62-64, 77-80, 84. One city official believed that the duties and assignments for Rivarola would be different because the city council was putting more emphasis on economic development, and the scope of work expectations for the City Administrator position were being expanded given that the position was being transitioned from a part-time position to a full-time position. *Id.* Another city official testified that the scope of the work expected of Rivarola was extended beyond what was expected of Martley. *Id.* Thus, although the job description for City Administrator did not change from Martley to Rivarola, the expectations for the job did change, along with the effort required, and it changed because Martley

---

who works forty hours per week, even if their jobs are otherwise exactly the same and the pay differential cannot be explained by the extra hours." *Id.* at 621. This suggests that such a comparison would be appropriate if the pay disparity claimed is based on the <u>rate</u>, not the total compensation. As explained below, Martley does not allege disparity in the rate of pay, but instead contends he is entitled to the same <u>total</u> compensation as Rivarola even though he performed City Administrator duties on a part-time basis, while she serves full-time.

worked the job part-time and Rivarola worked it full-time. This would have been the case regardless of the label used. Thus, it cannot be said that the work done by Martley and Rivarola was substantially equal.

Martley contends that "Defendants offer no evidence about actual time spent by Rivarola performing City Administrator duties as compared to actual time spent by Martley" and that there is "no <u>evidence</u> presented by Defendants that Rivarola was tasked with any additional duties or responsibilities!" Doc. 299 at 102, 105-06. But it is Martley's burden to show that the two positions were substantially equal, not Defendants' burden to disprove it. *See Lewis*, 375 F. App'x at 824 ("Lewis argues that Horton did not put forth any competent evidence showing the full extent of Dean Anderson's job duties. . . . However, as plaintiff she bears the burden of meeting her prima facie case." (internal quotations omitted)). As discussed above, Martley has not shown sufficient facts from which a reasonable jury could conclude that he and Rivarola performed substantially equal work. He was serving as City Administrator on part-time basis, and his primary responsibility as Police Chief necessarily limited the effort he could put into that role. Rivarola serves on a full-time basis, and accordingly, the expectations for the work she performs as City Administrator is necessarily more expansive. Under these circumstances, the positions are not substantially equal.

As a point of clarification, the Court does not propose a per se rule that part-time and full-time positions can never be compared, nor does it hold that the labels in and of themselves are the deciding factor. If a plaintiff alleged an unequal rate of pay, then the distinction between part-time and full-time might take on less relevance. *See Lovell*, 295 F. Supp. 2d at 619 ("Although the statutory language does not conclusively answer this question, Congress's use of the word 'rate' points persuasively to the conclusion that a valid comparison is not necessarily foreclosed merely

on the basis of a difference in the number of hours worked per week."); *see also* 29 U.S.C. § 206(d)(1) ("No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees in such establishment <u>at a rate</u> less than the rate at which he pays wages to employees of the opposite sex . . . ." (emphasis added)).

However, there can be no other logical conclusion in this case under these particular facts. Martley's EPA claim is not based on an unequal <u>rate</u> of pay between him and Rivarola. Instead, Martley compares the <u>total compensation</u> they each received. It's therefore only fair to consider the total time and effort dedicated to serving in that role. As discussed above, it is not reasonably disputed that Martley dedicated only some of his time to being City Administrator, while his "first responsibility" was being Police Chief. Rivarola's service as City Administrator was not so constrained. Martley has not presented <u>any facts</u> showing that the time spent by each was equivalent. The Court cannot interpret the EPA to require that an employee working, for example, 20 or 25 hours a week must be paid the same in terms of <u>total compensation</u> as an employee working 40 hours a week, simply because they were performing the same generalized duties. At the very least, Martley points to no authority that would require as much. He has therefore failed to make a prima facie claim of an EPA violation and Defendants are entitled to summary judgment on his EPA claim.

## 2. Affirmative Defenses

Even if Martley could establish a prima facie claim, Defendants alternatively argue that they would still be entitled to summary judgment because the facts demonstrate that Rivarola's salary was based on something other than sex.[11]

---

[11] Defendants argue that Rivarola's pay was both based on a merit system and on factors other than sex. Doc. 290 at 14-17. These are two separate defenses under the EPA. *See* 29 U.S.C. § 206(d)(1). But the facts relied on in the merit-based defense seem to be incorporated into the other defense. Thus, the Court focuses on Defendants' overall argument that Rivarola's salary was set considering factors other than sex.

As discussed above, if a plaintiff can establish a prima facie claim, the burden shifts to the defendant to justify the wage disparity based on one of four reasons: "(1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; (4) a disparity based on any factor other than sex." *Mickelson*, 460 F.3d at 1311 (internal quotation and citation omitted). This is a burden of persuasion: a defendant must prove such a defense "so clearly that no rational jury could find to the contrary." *Riser*, 776 F.3d at 1198 (internal quotation and citation omitted).

In arguing that the wage disparity between Martley and Rivarola was based on factors other than sex, Defendants again point to the fact that her position was full-time and his was part-time, that she has different qualifications and experience compared to Martley, that the City Administrator job posting stated that salary would be $100,000 or commensurate with experience, and that salary surveys conducted by City officials showed that salary was in line with that offered by similarly sized municipalities. Doc. 290 at 17. Additionally, the City Administrator before Martley was a man who served full-time and was also paid more than Martley (more than double Martley's City Administrator pay), which suggests the difference in the pay Rivarola received was not based on sex. Doc. 306 at 241.

Considering these facts, the Court finds Defendants have carried their burden of persuasion. The primary reason proffered by Defendants to explain the wage disparity is the fact that Martley served part-time and Rivarola served full-time. *See id.* at 62-63 (citing testimony of City officials that Rivarola's higher salary was based on fact that the expectations for the job were expanded because Rivarola was serving full-time); *see also* Doc. 299-6 at 6. It is also undisputed that the job posting for the full-time position that Rivarola filled indicated an intention to pay whoever took the job more than Martley was paid for his part-time role.[12] And significantly, the

---

[12] Martley very briefly argues that "there is direct evidence of gender bias in Defendants' process of hiring a new City Administrator," for which he cites to his approximately 70 facts that he says show Defendants cannot

person who held the job in a full-time capacity before Martley was <u>also</u> paid more than Martley (something Martley knew and did not complain about), and he was a man. These facts clearly support the conclusion that full-time City Administrators were paid more than part-time City Administrators, regardless of sex. *See Riser*, 776 F.3d at 1198 ("At the summary judgment stage, this means an employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary." (internal quotation and citation omitted)). No reasonable jury could conclude otherwise. This would entitle Defendants to summary judgment even if Martley had established a prima facie claim.

Further, it is undisputed that Rivarola had more job-specific qualifications to serve as City Administrator than Martley had, including previous experience as City Administrator. A city official testified that "she certainly had credentials that were out there so from a comparative basis with other cities I felt that the salary that was being offered to her was appropriate." Doc. 299-6 at 9; *see also* Doc. 306 at 79-80. By contrast, the resolution that originally appointed Martley

---

conclusively prove that the pay differential between him and Rivarola was "free from any motivation based on gender." Doc. 299 at 108. Defendants do not substantively respond to this argument or facts, other than to say that they should be disregarded because the Court previously denied Martley leave to file an amended complaint with these allegations. *See* Doc. 306 at 225, 241-42. But denial of leave to amend was based on untimeliness and delay. Doc. 251. Certainly, the claims in the case are set at this point. But that doesn't mean Martley cannot rely on facts learned in discovery to support his legal arguments for the claims that are in this case. Martley alleges that the City Clerk, who was involved in the hiring of the new City Administrator, testified that, in her personal opinion, she thought a woman would be best for the job. Doc. 299 at 92. Another city official also said he would like to see a woman in the position for a "change of culture." *Id.* at 98. Martley also presents facts to suggest that some of the male candidates had more experience than the female candidates, yet all the candidates selected for interviews were women. *Id.* at 91-99.

To the extent these facts may be sufficient to show sex discrimination in the hiring process, Martley asserts no claim for discriminatory hiring, nor could he since he didn't apply for the full-time City Administrator job. Nor do these facts mean "Defendants cannot conclusively prove that the decision to pay Rivarola significantly more than Martley was free from any motivation based on gender." *Id.* at 108. The preference of two people involved in the hiring for the selection of a woman does not demonstrate that the decision to <u>pay</u> Rivarola more than Martley was motivated by sex. None of the facts cited relate to the determination of pay at all. Further, based on the job posting, whoever took the job was going to be paid markedly more than Martley, regardless of sex. Finally, even if these facts create a question of fact as to whether sex was the deciding factor in the pay differential, Defendants would still be entitled to summary judgment on Martley's EPA claim because he has not met his prima facie showing, as discussed above.

"acknowledges that Chief Martley is not trained as a City Administrator and is likely unfamiliar with many of the duties performed by an Administrator." Doc. 290-1 at 1. Whether or not this is sufficient to justify Rivarola's additional pay under a "merit system" defense, these facts only add to the conclusion that the pay disparity was not motivated by sex. *See Mickelson*, 460 F.3d at 1313 ("Of course, Mr. Shelton had the most experience of all—eighteen years—and if he were the only higher-paid MSC at NYL's Leawood office, we might well conclude that his experience so far outweighed the women's experience that no rational trier of fact could conclude other than that his experience was the determinative factor in setting his salary."); *Angove v. Williams-Sonoma, Inc.*, 70 F. App'x 500, 508 (10th Cir. 2003) ("However, where an employer sets a new employee's salary based upon that employee's previous salary and the qualifications and experience the new employee brings, the defendant has successfully invoked the Act's affirmative defense.").

Accordingly, the Court finds that Defendants are entitled to summary judgment on Martley's EPA claim.[13]

## B.    Retaliation

### 1.    Equal Pay Act and First Amendment Retaliation Claims

Martley asserts retaliation claims against Defendants under the EPA and First Amendment. Defendants move for summary judgment on both claims because Martley did not suffer an adverse action.[14] A claim for retaliation under the EPA requires a showing of (1) protected activity, (2) adverse action subsequent to or contemporaneous with the protected activity, and (3) a causal connection. *Allen v. Garden City Co-op, Inc.*, 651 F. Supp. 2d 1249, 1258 (D. Kan. 2009). A prima

---

[13]  The parties dispute whether Martley has asserted an EPA claim against Breuer individually, and if so, whether that is proper. Because the Court finds Martley's EPA claim fails, it does not reach this issue.

[14]  Defendants also challenge the causal connection between the protected activity and the allegedly adverse action. But because whether there was an adverse action is conclusive of the claim, the Court does not consider causation.

facie case of retaliation under the First Amendment includes: (1) constitutionally protected activity, (2) an injury that would chill a person of ordinary firmness from continuing to engage in protected activity, and (3) a showing that the defendant's actions were substantially motivated as a response to the constitutionally protected activity. *Salemi v. Colo. Pub. Employees' Ret. Ass'n*, 747 F. App'x 675, 698 (10th Cir. 2018).

The Court focuses on the second element of each claim, which is typically referred to as adverse action. Retaliation claims under the EPA invoke the same standard as those brought under Title VII. The standard for evaluating retaliation claims under the First Amendment is analogous. Thus, for purposes of both retaliation claims, an adverse action is something that would dissuade a reasonable worker from engaging in protected activity. *See Lincoln v. Maketa*, 880 F.3d 533, 540 (10th Cir. 2018) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). The adverse action relied on by Martley is the referral of his retirement contributions for a criminal investigation. Doc. 299 at 111; *see also* Doc. 284 at 10.

The Court previously addressed whether the investigation into Martley's retirement contributions constitutes an adverse action sufficient to sustain a retaliation claim. *Martley v. Basehor, Kansas, City of*, 537 F. Supp. 3d 1260, 1265-67 (D. Kan. 2021). This was in the context of an earlier motion to dismiss by Rivarola. The Court first examined *Berry v. Stevinson Chevrolet*, which held that "the filing of charges against a former employee may constitute adverse action." 74 F.3d 980, 986 (10th Cir. 1996). The plaintiff in *Berry* was accused of theft and forgery, which led to charges, a trial, and a subsequent acquittal. *Id.* at 984. *Berry* focused on the impact of a "criminal prosecution" and "criminal trial" as a public event with "significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *Id.* at 986-87.

But a criminal investigation is not automatically considered an adverse action, as the Tenth Circuit later held. In *Dick v. Phone Directories Co.*, the defendants were accused of filing a police report against the plaintiff for retaliatory reasons. 397 F.3d 1256, 1269 (10th Cir. 2005). The Tenth Circuit found that filing a police report was not an actionable adverse action because the plaintiff did not stand trial, no formal charges were ever brought, and there was "no evidence that the matter persisted beyond the filing of the report." *Id.* Unlike in *Berry*, there was no risk of humiliation, damage to reputation, or harm to future employment prospects. *Id.* The Tenth Circuit concluded that "the police report in this context cannot be considered an adverse employment action." *Id.*

The Tenth Circuit further distinguished *Berry* in *Lincoln v. Maketa*. The plaintiff in *Lincoln* alleged he had been subjected to a criminal investigation, including interrogations, lie-detector tests, and accusations of theft, in retaliation for supporting a sheriff's political opponent. 880 F.3d at 536. The plaintiff's children were also investigated. *Id.* The Tenth Circuit found those facts did "not implicate the concerns that drove our decision in *Berry*" because there were no allegations that the "criminal investigation was made public or that it resulted in humiliation, damage to reputation, or harm to [the plaintiff's] future employment prospects." *Id.* at 540-41.[15] The Tenth Circuit specifically distinguished a criminal investigation from the filing of formal charges and bringing someone to trial. *Id.* at 540.

In its prior order, the Court made the following summary of this caselaw:

> From these cases, the Court concludes that the initiation of a criminal investigation may, under certain circumstances, constitute an adverse action sufficient to state a plausible claim of retaliation, but it must include some degree of concrete—not speculative— harm to reputation or future employment prospects. Here, there are no facts alleged that rise to that level. . . . [A]voidance of the criminal investigation altogether is not the type of harm contemplated by

---

[15]  *Lincoln* was evaluating a qualified-immunity defense, *see* 880 F.3d at 541, which the Court addresses below.

> *Berry*, *Dick*, and *Lincoln*. Something more is required to rise to the
> level of an adverse action[.]

*Martley*, 537 F. Supp. 3d at 1266-67.

Martley argues that *Berry* and *Dick* should not be relied on because they were decided before the Supreme Court issued *Burlington Northern & Santa Fe Railway. v. White*.[16] Martley argues that *White* changed the standard from "adverse employment action," which was the standard used in *Berry* and *Dick*, to "materially adverse action." Doc. 299 at 112. In *White*, the Supreme Court considered "whether Title VII's antiretaliation provision forbids only those employer actions and resulting harms that are related to employment or the workplace." *White*, 548 U.S. at 61. The Supreme Court concluded that antiretaliation laws are "not limited to discriminatory actions that affect the terms and conditions of employment" and stated that the true inquiry is whether "a reasonable employee would have found the challenged action materially adverse." *Id.* at 64, 68.

While Martley is correct that *White* changed the standard for what can be considered an adverse action—extending it beyond just employment-related actions—the Court disagrees that this renders *Berry* and *Dick* irrelevant. In particular, the analysis in *Dick*, which held that filing a police report is not an adverse employment action, did not turn on the fact that it was an action outside the employment context. Rather, it was because it did not carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *Dick*, 397 F.3d at 1269. In other words, it was the lack of adversity that mattered, not that it was unconnected to the plaintiff's employment, which was the point in *White*. The Court further notes that the Tenth Circuit in *Lincoln*—a post-*White* case—cited *Dick* for the proposition that "the fact

---

[16] Martley characterizes *Berry* as holding that "encouraging filing of criminal charges is not an adverse employment action." Doc. 299 at 112. But as discussed above, *Berry* actually held that "the filing of charges against a former employee may constitute adverse action" if it leads to criminal prosecution. *Berry*, 74 F.3d at 986.

that the investigation had a 'criminal' aspect does not necessarily create an adverse employment action," absent additional humiliation or harm to reputation or employment prospects. *See Lincoln*, 880 F.3d at 540-41. Based on this, the Court is unpersuaded that these authorities, particularly *Dick*, are no longer good law.[17]

Accordingly, in the context of summary judgment, the Court must consider whether there is a genuine issue of material fact about whether the criminal investigation into Martley rises to the level of an adverse action sufficient to sustain a retaliation claim as outlined by these authorities. It is uncontroverted that no charges were filed against Martley. Doc. 299 at 28. As explained above, the initiation of a criminal investigation, without more, is generally not sufficient to sustain a retaliation claim under *Berry*, *Dick*, and *Lincoln*.[18]

Martley fails to identify facts that would demonstrate his case is more like *Berry* than it is like *Dick* and *Lincoln*. Instead, he points to more than 300 facts that he says demonstrate that the investigation was "egregiously underhanded, retaliatory, spiteful, and an abuse of power." Doc. 299 at 115. But <u>why</u> Defendants undertook any actions goes to the third element of a retaliation claim—the causal connection between the claimed adverse action and the protected activity. As the Court has previously pointed out, *see Martley*, 537 F. Supp. 3d at 1266 n.3, the motivation of Defendants, no matter how retaliatory it may seem, does not automatically transform the complained-about action into an actionable adverse action. *See White*, 548 U.S. at 68 ("We speak of <u>material</u> adversity because we believe it is important to separate significant from trivial harms.").

---

[17]   Martley argues that "*Lincoln* is of no consequence" because it was considering a motion to dismiss, not a summary-judgment motion. Doc. 299 at 112 n.44. The Court disagrees that this renders *Lincoln*'s analysis irrelevant, so long as it is considered in the proper procedural context of this case.

[18]   Importantly, Martley's position would potentially open a retaliation claim anytime an employer confronting a disgruntled employee reported conduct to law enforcement for an investigation, which seemingly impacts the employer's First Amendment rights.

Martley offers precious little to show that he even suffered any negative consequences from the investigation—essentially just one parenthetical in one sentence that states the investigation "spanned well over a year and has caused him significant damages." Doc. 299 at 115. That parenthetical includes a footnote citing to nine statements of fact. Six of those facts relate to Martley's contention that the City was obligated to set up a separate retirement fund for his earnings as City Administrator but has failed to do so. *See id.* at 100. But it's unclear how unpaid retirement earnings would be damages or harm attributable to the criminal investigation, let alone how it shows that the criminal investigation is an actionable adverse action. Two more of the facts allege that the City has declined to provide insurance and representation for him and that he has had to pay back the retirement contributions on his own. *Id.* at 100-01. But again, it's unclear how this demonstrates that the criminal investigation is an actionable adverse action. To the extent Martley has a claim for reimbursement, that is a separate matter. To the extent he argues that he was wrongfully made to fund his own defense, that does not transform the criminal investigation into an actionable adverse action under the Tenth Circuit's precedent, as most anyone facing a criminal investigation is responsible for providing or securing their own defense, and the Tenth Circuit has made it clear that initiating a criminal investigation will not support a retaliation claim.[19]

In the final fact, Martley contends that he has sustained "significant emotional, reputational, and professional (e.g. his law enforcement license, standing with KS-CPOST, and future employability) damages because of the actions of Defendants." *Id.* at 101. It goes without saying that conclusory claims of "emotional, reputational, and professional . . . damages" do not

---

[19]  To be clear, Martley does not explicitly make this argument. The Court merely considers what his oblique reference to certain factual allegations might mean.

create an issue of fact as to whether the investigation amounts to an adverse action under the precedent discussed above and extensively in the prior order.

Martley also incorporates his declaration in full, though he makes no specific arguments that anything contained in the declaration creates a genuine issue of material fact. *See* Doc. 299 at 115 n.53. Nevertheless, the Court has reviewed it. But nothing in it warrants submission of this issue to a jury. The declaration states that the investigation has become known to Martley's former colleagues, which has tarnished his "previously unblemished reputation as an upstanding citizen and public servant in and around the City." Doc. 299-1 at 4. As a result "people now avoid me when they see me in the community." *Id.* at 5. But the law does not immunize Martley from "petty slights or minor annoyances." *White*, 548 U.S at 68. Avoidance by community members might be a breach of civility, but it's not "material adversity" typically actionable under the law. *Id.*

Martley also states in his declaration that if he were to return to working in law enforcement, he would be subject to background checks that could reveal the criminal investigation into his retirement contributions. Doc. 299-1 at 7. "If" he returns to law enforcement, Martley will also be subject to the oversight of KS-CPOST, which oversees "a police officer's certification for conduct that KS-CPOST determines reflects on the honesty, trustworthiness, integrity, or competence of the officer." *Id.* According to Martley, the "allegations against me are of a nature that is likely to be deemed by KS-CPOST to reflect on my honesty, trustworthiness, integrity, and competence and, therefore, would jeopardize my police officer license and my ability to return to my law enforcement occupation." *Id.* He also contends that the damage to his reputation "has a tendency to damage future employability because the allegations against me would impact my ability to obtain work as a civil servant for a municipality." *Id.* at 8.

These statements in Martley's declaration fail to create a genuine issue of material fact as to whether the criminal investigation rises to the level of an adverse action sufficient to sustain a retaliation claim.[20] It is undisputed that Martley retired in 2018. The possibility that Martley might decide to return to work in law enforcement or with a municipality at some point, and that certain background checks or certification agencies might uncover the investigation, and it might jeopardize his future employment is not sufficient to transform the criminal investigation into an actionable adverse action under *Dick* or *Lincoln*. Those cases distinguished between criminal investigations and formal charges that lead to a public criminal trial. They noted that the latter carries a "significant risk" of harm to reputation or future employment prospects. *Dick*, 397 F.3d at 1269; *Lincoln*, 880 F.3d at 540-41. Martley's speculation that the investigation may interfere with his future hypothetical employment plans does not rise to the level of the "significant risk" contemplated by *Dick* and *Lincoln*.[21]

Finally, the Court addresses some of the authorities relied on by Martley to support his claim that he suffered an adverse action. The first is *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079 (10th Cir. 2007). Martley argues this case "nullifie[s]" Defendants' summary-judgment motion. Doc. 299 at 110. In *Williams*, the defendants had allegedly threatened to go public with rumors about the plaintiff's sexual conduct that could have ruined her marriage and also opposed the plaintiff's requests for unemployment benefits to stop her claims of discrimination. The court

---

[20] Again, Martley does not specially argue this point in his response, beyond a footnote citation to his declaration. Although the Court has gone looking and tried to put the pieces together, Martley has failed to satisfy his obligations under the summary-judgment standard.

[21] Martley previously sought leave file a fourth amended complaint to add some of these allegations. The Court denied leave to amend for lack of good cause under Rule 16 and undue delay and failure to cure deficiencies under Rule 15. The Court also noted that the proposed amendment would also likely fail due to futility because the speculation that the investigation could possibly hurt future employment standards likely was not concrete enough harm to sustain a retaliation claim. Doc. 251 at 8 n.8. However, it ultimately did not rely on futility due to the failure to meet other standards under Rule 16 and Rule 15. *Id.*

found that a "reasonable employee could well find such a combination of threats and actions taken with the design of imposing both economic and psychological harm sufficient to dissuade him or her from making or supporting a charge of discrimination." *Williams*, 497 F.3d at 1090. Martley relies on *Williams* along with some other authorities to argue that "a criminal investigation and the threat of criminal prosecution" is sufficient to create an adverse action. Doc. 229 at 11. But this is directly contrary to the holdings of *Dick* and *Lincoln*, which concluded that a criminal investigation—which would always carry the threat of prosecution—is not an adverse action without something more. Thus, the Court declines to rely on Martley's interpretation of *Williams* where other cases are more directly on point.

Second, Martley relies on *Everitt v. DeMarco*, which held that although many courts "have held that an investigation of a public employee, standing alone, does not constitute an adverse employment action," the "highly fact-specific nature of the . . . inquiry" warranted denial of summary judgment in that case. 704 F. Supp. 2d 122, 133-34 (D. Conn. 2010). Although the Court has no grounds to disagree with *Everitt*'s analysis based on the facts and arguments presented there, it is not binding authority on this Court, and its approach is difficult to reconcile with the Tenth Circuit's authority in *Dick* and *Lincoln*.

Martley additionally relies on *Hobgood v. Illinois Gaming Board*, 731 F.3d 635 (7th Cir. 2013). In *Hobgood*, the plaintiff was brought up on charges before a gaming board allegedly in retaliation for helping a co-worker with a discrimination suit by providing confidential documents. *Id.* at 638-41. The gaming board recommended termination, though that was later set aside by an administrative law judge in favor of a 60-day suspension. *Id.* The court focused primarily on the causation element, noting that the other elements—protected activity and adverse action—required

only "brief comment." *Id.* at 642. The plaintiff's suspension and subsequent termination satisfied that element. *Id.* at 643. There are no similar circumstances here.

Accordingly, Defendants are entitled to summary judgment on Martley's retaliation claims under both the EPA and the First Amendment because he has not identified any facts that would allow a jury to find he suffered an adverse action.

### 2.    Qualified Immunity

Defendants alternatively argue that Breuer is entitled to qualified immunity on Martley's First Amendment retaliation claim. Doc. 290 at 23-25. Qualified immunity requires a plaintiff to show that (1) the defendant's actions violated a constitutional right, and (2) the constitutional issue was clearly established. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The Court has addressed a similar qualified-immunity defense raised by Rivarola, who was previously named as a party. *Martley*, 537 F. Supp. 3d at 1267-69. The Court noted that *Lincoln* "plainly holds that a First Amendment retaliation claim based on the instigation of a criminal investigation is not a clearly established constitutional issue." *Id.* at 1268 (citing *Lincoln*, 880 F.3d at 540-41). For the same reasons, Breuer is also entitled to qualified immunity.

Martley argues that Breuer's claim of qualified immunity must be rejected because Defendants have not provided "any discussion or citation to the powers or authority held by or available to a mayor of a city of the second class" and the absence of proof that Breuer was acting within discretionary authority is fatal to his qualified-immunity defense. Doc. 299 at 101-02. Martley offers no further analysis on the issue of qualified immunity. *Id.*

The Tenth Circuit has rejected a similar argument. In *Elwell v. Byers*, the plaintiffs alleged that a foster child was wrongfully removed from their care. In addressing the qualified-immunity

defense by the state officials, the court rejected the argument that a failure to establish discretionary function waived the defense:

> Qualified immunity only extends to "government officials performing discretionary functions." . . . Because the discretionary-function question is quite obvious in many cases, it is frequently omitted from the qualified immunity analysis. . . . It is quite apparent that Kaufman and Byers were engaging in official, discretionary functions when they decided to remove T.S. without prior notice. Perhaps for this reason, the discretionary-function element was not a matter of dispute below. Accordingly, we find meritless the Elwells' argument that Byers and Kaufman waived their entitlement to qualified immunity by not mentioning this point in their opening brief.

699 F.3d 1208, 1213 n.3 (10th Cir. 2012) (internal citations omitted). Here, the discretionary nature reporting a matter for criminal investigation seems equally obvious as well.

Moreover, qualified immunity for Breuer seems appropriate because there is almost no evidence that Breuer was even involved in referring the matter to the sheriff's department for investigation, which would mean that he did not violate Martley's constitutional right as alleged. *See* Doc. 290 at 25. Defendants assert that "Breuer testified that he did not have any input into the decision to ask the Sheriff's Department to look into Plaintiff's income mis-reporting." *Id.* (citing DSOF 44). Martley attempts to dispute this fact because Breuer testified that he said "okay" and "[i]f that's what you're supposed to do, that's what you're supposed to do" when Rivarola told him she was planning on referring the issue for investigation. *See* Doc. 299 at 25-26. This does not establish that Breuer took any action to violate Martley's constitutional rights, discretionary or otherwise, with regard to the investigation.

## IV.    CONCLUSION

The Court again reiterates that this has been a contentious case. The parties and their counsel have litigated it vigorously, which has unfortunately sometimes clouded the issues and

undoubtedly led to unnecessary expense. The Court has endeavored to push through that antagonism and focus on the law and the facts presented and give a detailed analysis of the issues. The facts of this case do not support any triable issues on the legal claims asserted, and no reasonable jury could find for Martley on the record before the Court.

THE COURT THEREFORE ORDERS that Defendants' Motion for Summary Judgment (Doc. 289) is GRANTED.

THE COURT FURTHER ORDERS that Martley's Motion for Leave to File Surreply (Doc. 307) is DENIED.

THE COURT FURTHER ORDERS that Defendants' Motion to Exclude Expert Testimony of Kurt Krueger (Doc. 309) is DENIED AS MOOT.

IT IS SO ORDERED.

Dated: November 4, 2022                            /s/  *Holly L. Teeter*
                                                                HOLLY L. TEETER
                                                                UNITED STATES DISTRICT JUDGE